# Presidential Power to Expel Diplomatic Personnel from the United States

The President has inherent constitutional power to declare foreign diplomatic personnel *persona non grata* and to expel them forcibly from the United States; the exercise of this power is consistent with international law, including specifically the Vienna Convention on Diplomatic Relations.

Inherent in the President's power to recognize foreign countries and their ministers is implied power over the physical premises of diplomatic properties, including power to take actions necessary to protect embassies from damage, and to deny possession to or to eject those not recognized as diplomatic personnel of the sending state.

A foreign diplomat who has been declared *persona non grata* and ordered to leave the country does not lose his diplomatic status, and thus should not be able to assert any legal entitlement to remain in the United States under the Immigration and Nationality Act; nor should such an individual be able to frustrate or delay execution of an expulsion order by renouncing his diplomatic status. The Secretary of State may revoke the visas of diplomats declared *persona non grata* to forestall their invocation of the INA as a basis for challenging the President's expulsion order.

Federal law enforcement officials, particularly the Secret Service, have authority to protect Iranian diplomatic property against third parties, including any persons not currently recognized by the United States as accredited diplomatic personnel. The President is authorized to call on the full range of his resources in the Executive Branch, including the military, and also on the resources of state or local law enforcement agencies, to carry out an expulsion order in this situation.

The Due Process Clause of the Fifth Amendment at most requires only a determination that a diplomat about to be expelled from the United States pursuant to the President's order is in fact the person ordered to be expelled; an expulsion order is arguably subject to judicial review, on a writ of habeas corpus, but only on the limited grounds of mistaken identity.

April 4, 1980

## MEMORANDUM OPINION FOR THE DEPUTY ATTORNEY GENERAL AND THE ASSOCIATE ATTORNEY GENERAL

This responds to your joint request for our views regarding the authority of the President to expel foreign diplomatic personnel from the United States, to maintain control over the premises of Iranian diplomatic property in connection with that expulsion, and the legal constraints placed on that authority by international and domestic law and by our Constitution. For the reasons stated hereafter, we believe that the President has the authority to declare a nonresident alien who is a member of the staff of a foreign diplomatic or consular post in the United States to be *persona non grata*, forcibly to expel such diplomatic

personnel from the United States within a reasonable period of time (as set by the President) after being declared *persona non grata*, and to take all steps reasonably designed to secure all Iranian diplomatic properties and limit their use to diplomatic activities conducted by a third nation acceptable to the President. We conclude that the exercise of this power over diplomatic personnel is not constrained by the Immigration and Nationality Act of 1952, and that the Constitution requires only that a procedure reasonably calculated to insure that personnel actually expelled are those previously declared *persona non grata* be utilized.

We also conclude that prior to their expulsion, diplomatic personnel are not entitled as a matter of law to assert any federal statutory right to remain in this country as a means of avoiding their expulsion.[1] Finally, we believe that judicial review of any actions taken by the President related to expulsion would be limited to possible inquiry by habeas corpus into the question whether a particular person to be expelled was in fact previously declared *persona non grata*.[2]

## I. Presidential Authority Over Diplomatic Personnel and Property

The President's authority over foreign diplomatic personnel derives from his power, under Article II, § 3 of the Constitution, to "receive Ambassadors and other Public Ministers." This provision is the basis of the President's power to grant or withdraw recognition to foreign governments and their ministers, a power regarded as textually committed to the Executive alone. See *Jones* v. *United States*, 137 U.S. 202, 212 (1890); *Baker* v. *Carr*, 369 U.S. 186, 212-13 (1962).[3] The President's power to accept or reject a particular envoy has been beyond serious question since President Washington demanded the recall of Citizen Genet, the French Minister. In 1855, the Attorney General took the position that this right of reception, and therefore rejection, extends to "all possible diplomatic agents which any foreign power may accredit

---

[1] A separate international legal question would be raised in the event of a claim of political asylum by one of the individuals whose departure is ordered. The United States is a party to the 1967 Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, T.I.A.S. 6577. This Protocol obliges us not to expel or return a refugee to a territory where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion. The Protocol defines "refugee" as a person who, owing to well-founded fear of such persecution, is outside the country of his nationality and is unable or, owing to such fear, is unwilling to avail himself of the protection of that country.

There is no exception provided in the Protocol with respect to diplomatic and consular personnel and, in practice, such personnel have been accorded the benefits of the Convention.

It would seem unlikely that any Iranian diplomatic or consular personnel who remain officials of the present government of Iran, more than one year after its establishment, would have a reasonable fear of persecution by that government. Nevertheless, such claims are possible, and the United States should have a procedure for assuring that expulsion will not violate our treaty obligations under the Refugee Protocol. A possible approach to this problem is described in Part III of this memorandum.

[2] We note that the analytical basis for the conclusions set forth above and the reasoning set forth below is drawn to a great extent from a series of memoranda from this Office to the Attorney General dating from November of 1979. We would also note that we use the terms diplomatic personnel and diplomatic property herein to include both diplomatic and consular personnel and property; for our purposes, legal distinctions among these classes are either irrelevant or specifically noted.

[3] *See generally* 2 B. Schwartz, The Powers of the President 104–09 (1963).

to the United States." 7 Op. Att'y Gen. 186, 209 (1855); 5 Moore, International Law Digest 15–19 (1906). It is recognized that the power to receive Ambassadors is a discretionary one which necessarily includes the right to refuse to receive them, to require their departure, and to determine their eligibility under our laws. 4 Moore, International Law Digest 473–548 (1906).

The President's power to receive and expel foreign diplomatic personnel is a power recognized to inhere in all sovereign nations by the 1961 Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 23 U.S.T. 3227, T.I.A.S. No. 7502. The President's power over diplomatic property is a concomitant of his power over diplomatic personnel to the extent that its exercise relates to his recognition power and his power over the conduct of our foreign relations and is likewise recognized by the Vienna Convention. Under Article 22 of the Vienna Convention, this country has a duty to take "all appropriate steps to protect the premises of the mission against any intrusion or damage and to prevent any disturbance of the peace of the mission." Article 45 of the Convention requires the receiving state to "respect and protect the premises of the mission, together with its property and archives," and authorizes the sending state to entrust custody of the premises to a third state acceptable to the receiving state where the receiving state orders the recall of diplomatic personnel.

Because diplomats and consuls who have been ordered to leave the United States have always complied, the President's authority to order their departure and to enforce such orders has never been subject to judicial challenge. However, individuals have from time to time claimed diplomatic status and have asserted a resulting entitlement to immunity from judicial process. In these cases the courts have consistently acknowledged that determinations as to whether an individual was recognized by the United States as a representative of a foreign government were properly within the province of the Executive. Accordingly, the courts have held that certifications by the Department of State are conclusive as to the status, privileges, and immunities of foreign diplomatic personnel. *In re Baiz,* 135 U.S. 403 (1890); *Carrera* v. *Carrera,* 174 F.2d 496, 497 (D.C. Cir. 1949). As discussed below, we believe an executive determination that an individual previously recognized as a diplomatic or consular representative had been declared *persona non grata* and was required to depart from the United States would be entitled to the same judicial deference under the rationale of these decisions. See *Adams* v. *Vance,* 570 F.2d 950 (D.C. Cir. 1978).

## II. Legal Constraints on the Exercise of the President's Authority

We have identified three types of authority which inform and potentially constrain the President's exercise of his authority to declare *persona non grata* and to expel foreign diplomatic personnel other than

personnel accredited to the United Nations and to regulate the use of diplomatic property.[4] The first and most directly relevant authority is international law, specifically the Vienna Convention on Diplomatic Relations. The second is federal statutory law, including the Immigration and Nationality Act of 1952, 8 U.S.C. §§ 1101 *et seq.* The third is the Due Process Clause of the Fifth Amendment of the Constitution. We will discuss each of these in turn.

*A. International Law*

1. Diplomatic personnel

Under international law it has long been recognized that every sovereign nation has the right to determine whether it will receive a diplomatic envoy from another nation and whether it will continue to receive and conduct official business with an envoy who has been accepted.[5] This right is reflected in Article 9 of the 1961 Vienna Convention on Diplomatic Relations, a codification in most material respects of prevailing customary international law on this subject. Article 9 provides that the receiving state may, at any time and without having to explain its decision, notify the sending state that any diplomatic officer is *persona non grata* or that a nondiplomatic staff member is no longer "acceptable." Following this determination, the sending state must either recall the person concerned or, "as appropriate," terminate that person's functions at the mission.[6]

Once declared *persona non grata,* foreign diplomatic personnel do not automatically lose their diplomatic status or the diplomatic immunities to which they are entitled under international law. Under ¶ 2 of Article 9 of the Convention, if the sending state "refuses or fails within a reasonable period to carry out its obligations" to recall or terminate the services of a diplomat declared *persona non grata,* "the receiving State *may* refuse to recognize the person concerned as a member of the mission." (Emphasis added.) You have asked us whether this remedy spelled out in Article 9, permitting the United States to strip diplomatic personnel of their diplomatic status if they have not left this country

---

[4] As indicated below, the President's power to compel the departure of diplomats accredited to the United Nations has been, subsequent to the ratification by the Senate of the Convention on the Privileges and Immunities of the United Nations in 1970, essentially the same as his power to expel diplomatic personnel accredited to this country. This Office currently has under consideration at the request of the Legal Adviser of the Department of State the question whether diplomats accredited to the United Nations enjoy the same immunity from application of paragraphs (27) and (29) of 8 U.S.C. § 1182(a) to their entering this country as diplomatic personnel accredited to the United States possess by virtue of 8 U.S.C. § 1102.

[5] E. Denza, Diplomatic Law 40 (1976) [hereafter Denza].

[6] The records of the International Law Commission reflect that the termination of functions option is intended to apply primarily to persons who are nationals of or permanently resident in the receiving state.

210

after a reasonable period of time[7] subsequent to their being declared *persona non grata* is, in effect, the exclusive remedy of the President to enforce Article 9. Stated another way, the question is whether, consistent with the Vienna Convention, the President through his agents may forcibly expel foreign diplomatic personnel from the United States subsequent to their being declared *persona non grata*. We believe that, consistent with the Vienna Convention, the President may do so.

It has long been customary for the sending states to withdraw diplomats voluntarily when those diplomats have been declared *persona non grata*. Thus, as indicated above, in American practice it has apparently never been necessary forcibly to expel such a diplomat. Although the Vienna Convention is silent on the question of the right of the receiving state forcibly to expel a diplomat after declaring him *persona non grata*, there is support in both customary practice and in the negotiating record of the Convention for the taking of this action by the receiving state following that determination. One authority cites the fact that the early cases reflecting this practice "are all described as cases of 'expulsion.' " [8] This authority comments further that the practice of requesting recall replaced expulsions "in the more placid political climate of the nineteenth century." [9]

We believe that this history suggests why the Vienna Convention itself does not specifically spell out the right of a receiving state forcibly to expel a diplomat. We would add that ¶ 2 of Article 9, read literally, does not purport either to require the receiving state to strip a foreign diplomat of his diplomatic status in this situation or suggest that remedy is the receiving state's exclusive remedy to deal with a situation in which the sending state has not fulfilled its clear obligation under Article 9 to withdraw its diplomat or to itself terminate the person's diplomatic status. Nothing in logic supports the proposition that we should assume the right to expel was abandoned as a matter of customary international law even though it was not specifically spelled out in the Vienna Convention.[10] In this connection, we note that the preamble to the Convention affirms "that the rules of customary international law should continue to govern questions not expressly regulated by the provisions of the present Convention." The Vienna Convention, by remaining silent on the question of expulsion, in no way precludes a receiving state from taking this action.

The position of the United States delegation to the United Nations Conference which drafted the Convention reflects the understanding of the U.S. government that a receiving state may require the departure of

---

[7] The drafting history of Article 9 of the Convention indicates that the "reasonableness" of the period following a *persona non grata* action is largely dependent on the attendant circumstances. These circumstances may be such as to warrant the receiving state's demand for immediate action.

[8] Denza, at 40.

[9] *Id.*, at 41.

[10] *Id.*, at 135–36.

a member of the diplomatic mission. In commenting on the question of allowing a "reasonable period" in which the sending state must act following a *persona non grata* determination, the delegation stated: "[I]n aggravating circumstances, or where national security is involved, the receiving State may demand his [the diplomat's] immediate *departure. . . .*" (Emphasis added.)

Further evidence of the United States' interpretation of customary international law and the practice of the government with respect to the expulsion of diplomats is found in the testimony of Department of State Legal Adviser Leonard Meeker before the Senate Foreign Relations Committee which considered proposed ratification of the Vienna Convention in 1965. Referring to the provision of the Convention (Article 41) which requires persons enjoying diplomatic privileges and immunities to respect the law of the receiving state, the Legal Adviser stated: "[I]f the situation becomes serious enough, we would have to in certain cases perhaps require the departure of members of the diplomatic missions *as we have a right to require and will have that right under the Convention, just as we do now.*" [11] (Emphasis added.)

Since 1965, the government has publicly voiced its views concerning the right to expel diplomats. For example, in its report issued regarding the ratification of the Convention on the Privileges and Immunities of the United Nations, the Senate Committee on Foreign Relations paid special attention to several reservations to the proposed Convention, one of which stated that:

> Persons who are entitled to diplomatic privileges and immunities under the Convention shall not be required to leave the United States otherwise than in accordance with the customary procedure applicable to members of diplomatic missions accredited or notified to the United States.

Ex. Rep. No. 17, 91st Cong., 2nd Sess. 5 (1970).

On its face, this reservation clearly assumes the existence of a nonstatutory, presidentially controlled and supervised procedure for the expulsion of foreign diplomatic personnel. More importantly for present purposes, the Senate Committee went on to state in its report:

> As a final recourse, under the proposed reservation and present law, the United States can compel the departure from its territory of anyone declared *persona non grata* . . . . [12]

---

[11] Exec. H. 88th Cong., 1st Sess. 9 (1965).

[12] We note that in the report to the President from the Secretary of State of November 6, 1969, recommending transmittal of the Convention to the Senate for advice and consent to ratification, the terms "compel" and "departure," "expulsion" and "expelled" are used interchangeably. Furthermore, that report contains no reference whatsoever to the Immigration and Nationality Act, which was apparently assumed not to apply to this issue at all.

Thus, it is unquestioned that the United States has traditionally maintained, and continues to maintain, the legal position consistent with prevailing rules of international law and practice and the Vienna Convention on Diplomatic Relations, that the receiving state has the right to require the departure, following *persona non grata* action, of alien nonresident members of the staff of a diplomatic mission.[13]

An argument that a diplomat may not be forcibly expelled by a receiving state could be made based on the principle articulated in Article 29 of the Vienna Convention that the "person of a diplomatic agent shall be inviolable" and that such a person "shall not be liable to any form of arrest or detention." We are not persuaded by that argument for several reasons. First, these provisions of Article 29 cannot and have not been read to mean that a diplomat's movement is not subject to any control, *see* Article 26 of the Vienna Convention, or that he cannot be prevented from taking action which violates the domestic law of the receiving state. [1957] 2 Y.B. Int'l L. Comm'n. 138.[14] For example, the Department of State has taken the position that foreign diplomats may be escorted off the New Jersey Turnpike when found to be speeding, even though they were clearly not subject to arrest for that offense.[15] We assume there would be no doubt that a foreign diplomat could be physically restrained from committing an assault on the streets of Washington, D.C., even though once again not subject to arrest for that assault, and that action could be taken without raising any substantial question under the Vienna Convention. In our view, an order of the President declaring foreign diplomats *persona non grata* with an accompanying order to depart the United States constitutes a legal determination under United States law that may be enforced in similar fashion so long as the foreign diplomat affected is treated "with due respect" as provided in Article 29.[16]

Under the analysis above, we believe the President has the constitutional power forcibly to eject diplomatic personnel declared by him to

---

[13] International law with respect to the treatment of consular officers and consular staff parallels that with respect to diplomats; Article 23 of the Vienna Convention on Consular Relations contains language nearly identical to that of paragraphs 1 and 2 of Article 9 of the Vienna Convention on Diplomatic Relations. Under this Article the receiving state may declare a consular officer *persona non grata* or a staff member unacceptable and may withdraw recognition or cease to consider the person as a member of the consulate if the sending state refuses to recall the person or terminate his functions "within a reasonable time." The official records of the UN Conference which adopted this article clearly reflect the intention to prescribe rules relating to the determination that a member of a consulate is *persona non grata* or no longer acceptable which are virtually the same as those relating to members of a diplomatic mission. The conferees specifically rejected proposals which would place consular personnel in a more advantaged position vis-a-vis diplomatic personnel. Thus, we conclude that consular personnel may similarly be required to depart the receiving state following *persona non grata* action. 1 Official Records UN Conference on Consular Relations 209–217.

[14] *Id., at 136.*

[15] *Hearings on Exec. H. Before a Subcommittee of the Senate Committee on Foreign Relations* 20 (1965) (drunk diplomat could be "haul[ed] off by the scruff of his neck").

[16] We believe the phrase "due respect" must be read to authorize the use of the minimum level of force necessary to deal with any resistance by diplomatic personnel to their expulsion. Likewise, that phrase in no way precludes personnel enforcing a presidential order from using reasonable force to defend themselves from violent acts against their persons.

213

be *persona non grata* from the United States and that the exercise of that power would be consistent with international law.

## 2. Diplomatic property

The President has sole power to recognize foreign countries and to determine the acceptability of their ministers; inherent in this authority is the implied power to control physical access to embassy premises in the United States. This includes the power to take necessary action to protect embassies from damage, and the power to deny possession to or eject those not recognized as diplomatic personnel of the sending state.

As with the expulsion of diplomatic personnel, an argument can be made that the President's power over the physical premises of diplomatic properties is limited by the principle set forth in Article 22 of the Convention that the premises of an embassy are "inviolable." This principle of inviolability is generally taken to mean that agents of the United States may not enter without consent of the head of the mission. At the same time, Article 22 imposes a duty on the receiving state to take "all appropriate steps to protect the premises of the mission against any intrusion or damage and to prevent any disturbance of the peace of the mission."

Article 45 of the Convention, however, modifies these commands somewhat in cases where, as here, the diplomatic personnel are temporarily recalled. It requires the receiving state to "respect and protect the premises of the mission, together with its property and archives," and authorizes the sending state to trust custody of the premises to a third state acceptable to the receiving state.

It is plain from the background of the Convention that the duty in Article 45 to "respect and protect the premises" does not mean full inviolability. Denza, *supra,* at 281. Although it is not clear when inviolability ends, analogy to our discussion above of Article 29 regarding termination of personal immunity suggests that inviolability should continue for a reasonable time after the premises cease to be used for diplomatic purposes. In turn, this suggests that if the premises are used for purposes incompatible with a diplomatic mission, such as an armed occupation, inviolability should cease at that point. In view of this, the Convention's provisions in Articles 22 and 45 protecting the integrity of the embassy premises suggest ample authority to control access to diplomatic property in these circumstances.

## B. Federal Statutory Law

## 1. Diplomatic personnel

The President's exclusive power over foreign diplomatic personnel as a matter of domestic law is explicitly and implicitly recognized in the

statute most directly relevant to the issues at hand, the Immigration and Nationality Act of 1952. Under § 102 of that Act, 8 U.S.C. § 1102, diplomatic personnel are generally exempt from the provisions of the Act "relating to ineligibility to receive visas and the exclusion or deportation of aliens." The legislative history of § 102 indicates clearly that the Congress, in leaving these matters to the President, was simply recognizing the constitutional limitations on its ability to control or regulate the President's constitutional power to receive (and expel) the foreign representatives of countries with whom we have diplomatic relations. *See* H.R. Rep. No. 1365, 82nd Cong., 2nd Sess. 34 (1952).

We believe this congressional recognition of the President's exclusive power to deal with foreign diplomatic personnel is relevant to a determination of the extent to which foreign diplomatic personnel, between the time they are declared *persona non grata* and the time they depart the United States or are forcibly expelled from the United States, may assert some legal entitlement to remain in the United States under the Immigration and Nationality Act. We do not believe they have any such entitlement during that period.

Both immigrant and nonimmigrant aliens, whether in this country legally or illegally, are generally entitled to claim various rights to remain in this country should it otherwise be determined that they are deportable. Indeed, § 241(e) of the Immigration and Nationality Act, 8 U.S.C. § 1251(e), recognizes that diplomatic personnel who fail to maintain their status as diplomatic personnel may not, when they lose their status, be required by the Attorney General to depart the United States without the approval of the Secretary of State except under certain limited circumstances. Thus, the Immigration and Nationality Act recognized that diplomatic personnel may lose their status and, in doing so, become legally entitled to assert other rights to remain in the United States. The question, however, is whether diplomatic personnel, so long as they are deemed by the President to retain that status, may claim statutory entitlements to remain in this country after they have been declared *persona non grata* and ordered to depart the United States.

In addressing this issue, we would first note that a construction of the Immigration and Nationality Act which would permit foreign diplomatic personnel having been declared *persona non grata* and ordered to leave the country to assert other legal rights to remain in this country and therefore, by virtue of the process to which they would be entitled, at the very least substantially delay their departure, would directly impinge on the President's power under the Constitution to deal with diplomats and to conduct our foreign relations. Particularly where the order for foreign diplomatic personnel to depart is directly related to the conduct of important foreign relations, which it clearly would be with regard to Iranian diplomatic personnel, we believe there would be a strong presumption against implying that Congress, by statute, gave

215

such diplomatic personnel the means to frustrate a decision by the President. *Cf. Narenji* v. *Civiletti,* 617 F.2d 745 (D.C. Cir. 1979) *cert. denied,* 446 U.S. 957 (1980). Generally, statutes should not be read to conflict with the Constitution, *Crowell* v. *Benson,* 285 U.S. 22, 62 (1932), treaties, *United States* v. *Lee Yen Tai,* 185 U.S. 213, 221–22 (1902), or the law of nations, *Lauritzen* v. *Larsen,* 345 U.S. 571, 578 (1953).

As indicated above, § 102 of the Act, 8 U.S.C. § 1102, generally sets foreign diplomatic personnel apart from other classes of nonimmigrants for purposes of the Act. There would appear to be no judicial precedent regarding what rights foreign diplomatic personnel might have to interpose legal objections based on federal substantive law to their being expelled from the country on order of the President. One line of authority, however, dealing with persons paroled into this country pursuant to § 212(d)(5) of the Act, 8 U.S.C. § 1182(d)(5), supports our conclusion that foreign diplomatic personnel should be viewed as having no such rights.

Under § 212(d)(5), the Attorney General is authorized to parole aliens into the United States under certain circumstances. Notwithstanding the fact that such parolees are physically within the United States, the Supreme Court has held that they are not entitled to assert any legal entitlement to remain in the country beyond the terms upon which they were paroled into the country even though, as a factual matter, they might otherwise qualify under the Immigration and Nationality Act to remain in the United States or at least to receive the Attorney General's consideration of their claim to legal entitlement to remain in the United States. *See Leng May Ma* v. *Barber,* 357 U.S. 185 (1958).

Although parolees, unlike foreign diplomatic personnel, do not technically have "nonimmigrant" status, both classes of persons are physically present in this country. In the case of parolees, the courts have determined that they have no entitlement to assert any legal right to remain in the country because they have not "entered" the country even though, as indicated above, they may be physically present not only at the border but indeed within the interior of the United States. A district court has summed up this concept of entry by stating that entry "means freedom from governmental restraint . . . ," *Klapholz* v. *Esperdy,* 201 F. Supp. 294, 297 (S.D. N.Y. 1961). These cases clearly establish the proposition that the Constitution does not itself affect the power of the Congress or the President to effect the removal of some classes of persons within our physical borders summarily.

In short, we do not believe that foreign diplomatic personnel have any statutory right to assert any legal entitlement to remain in the United States once they have been declared *persona non grata* and have been ordered to leave the country. This reading of the Immigration and Nationality Act is consistent with and supported by the doctrine, discussed *supra,* that statutes should be construed to avoid raising doubts

216

as to their constitutionality, *Crowell* v. *Benson, supra; Broadrick* v. *Oklahoma,* 413 U.S. 601 (1973). It is also consistent with the most recent expression by the Senate touching on this issue.

In its report regarding the ratification of the Convention on the Privileges and Immunities of the United Nations, the Senate Committee on Foreign Relations paid special attention to several reservations to the proposed Convention, one of which stated:

> Persons who are entitled to diplomatic privileges and immunities under the Convention shall not be required to leave the United States otherwise than in accordance with the customary procedure applicable to members of diplomatic missions accredited or notified to the United States.

Ex. Rep. No. 17, 91st Cong., 2nd Sess. 5 (1970). On its face, this reservation clearly assumes the existence of a nonstatutory, presidentially controlled and supervised procedure for the expulsion of foreign diplomatic personnel. More importantly, for present purposes, the Senate Committee went on to state in its report (*id.*):

> As a final recourse, under the proposed reservation and present law, the United States can compel the departure from its territory of anyone declared *persona non grata.* . . .

A separate question arises whether a foreign diplomat having been declared *persona non grata* and ordered to leave the United States could frustrate or delay the execution of that order either by himself renouncing his status as a foreign diplomat or having his diplomatic credentials revoked by his government. Although the issue is not free from doubt, we believe that neither the individual act of a foreign diplomat nor an act of the sending state which would substantially undermine the foreign policy objective of the President should be permitted to do so. Thus, were the President to determine that the quick and sure expulsion of an identified group of foreign diplomats would significantly advance the foreign policy interests of the United States, we would not read either international law, *i.e.,* the Vienna Convention, or domestic law, *i.e.,* the Immigration and Nationality Act of 1952, as permitting the frustration of that foreign policy·objective and the President's constitutional authority to carry it out. Under Article 9 of the Convention, failure of the sending state to withdraw its diplomatic personnel in such situations specifically entitles the receiving state to strip the foreign diplomatic personnel involved of their status as diplomats. We see no logical reason to suggest that Article 9 does not implicitly recognize the power of receiving states to take action short of totally withdrawing that status and the immunities that accompany that status. As indicated in Part I of this memorandum, we believe the President constitutionally may do so. In this situation, the status of the diplomatic

217

personnel does not necessarily revert to one of being merely "illegal aliens" in the United States.

This analysis also would apply, we believe, to a situation in which a foreign diplomat, rather than complying with a directive to depart the United States, went into hiding and was later found after the scheduled date for his departure had passed. In such a situation, we see no reason to recognize that act as bringing him within the protection of the Immigration and Nationality Act any more than a similar act committed by a parolee. Whether Congress could constitutionally provide such protections for "ex-diplomats" is a question we need not address; we simply conclude that Congress has expressed no intent in the Immigration and Nationality Act for such foreign diplomats to receive the benefits of the United States domestic law as a result of their defiance of an order issued by the President. Rather, Congress by its silence has left to the President the determination of when, for domestic law purposes, a foreign diplomat may lose that status and secure the benefits of our domestic law.

Notwithstanding the clear constitutional power of the President to receive ambassadors and public ministers, their status as nonimmigrant aliens under the Immigration and Nationality Act may make it prudent for the Executive to take certain actions that might make it more difficult for a recalcitrant Iranian diplomat to challenge successfully the President's decision in a federal court. Certain sections of the Act, particularly §§ 245 and 248, U.S.C. §§ 1255 and 1258 might be invoked as allowing a nonimmigrant to apply, as any other nonimmigrant may apply, to adjust his status or to change his classification. Since those sections entitle an alien "who is continuing to maintain" his nonimmigrant status to make such applications, it would seem prudent for the Executive to use powers conferred by the Immigration and Nationality Act which might forestall this eventuality. Section 221(i) of the Immigration and Nationality Act, 8 U.S.C. § 1201(i), provides that after the issuance of a visa "the Secretary of State may at any time, in his discretion, revoke such visa or other documentation. Notice of such revocation shall be communicated to the Attorney General and such revocation shall invalidate the visa or other documentation from the date of issuance." Thus, if the Secretary revoked the visas of diplomats who were declared *persona non grata,* the effect would be to cancel the diplomat's nonimmigrant status, with the result that his arguable entitlement to adjustment would disappear.

While termination of the status of a diplomat is rare in our practice, this is precisely what was done in 1961 in the case of Miroslav Nacvalac, a member of the Permanent Mission of the Czechoslovak Socialist Republic to the United States. The record indicates that prior to the revocation of Mr. Nacvalac's status under § 101(a)(15)(G) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(15)(G), he had

218

indicated an interest in discussing the possibility of remaining in the United States. In Press Release 421 dated June 21, the Department of State indicated that the effect of the revocation of Mr. Nacvalac's status "is to place [him] in the category of an alien illegally in the United States of America." The press release continued: "Under the laws and regulations of the United States of America, Nacvalac may elect to depart voluntarily or in lieu of such voluntary departure, be removed." A footnote to the press release, which was reprinted in the Department of State Bulletin Vol. XLV, page 67, indicated that Mr. Nacvalac left the United States the next day.

There have been only two decided cases in which a judge has confronted the question of visa revocation by the Secretary of State. In the first case there was no opinion. The second case, which was decided last year, is *Knoetze* v. *United States,* 472. F. Supp. 201 (S.D. Fla. 1979), *aff'd* 634 F.2d 207 (5th Cir.), *cert. denied* 454 U.S. 823 (1981). In that case Judge Rottger of the United States District Court for the Southern District of Florida sustained the Secretary's power to revoke visas. However, in his opinion he expressed concern that, when an alien whose visa was being revoked was in the United States, he did not have an administrative mechanism to insure that a revocation had not been erroneous. To meet this point, we believe that if it is decided for reasons of prudence to revoke visas of certain Iranian diplomats, the Department of State should establish an informal board of review to consider claims that revocation had been based on a mistake of fact.

In summary, we believe that the President has the authority to require the removal from the United States of diplomats declared *persona non grata.* However, we believe that prudence dictates that in certain cases we should revoke the visas of such diplomats in order to forestall invocation of sections of the Immigration and Nationality Act as a basis for challenging the President's decision. We believe that by using the revocation power, the government could demonstrate to a court that an objecting diplomat or consul had no colorable claim for relief under the terms of the Act.

2. Diplomatic property

Protection of embassy premises and diplomatic personnel is generally performed by the Secret Service's Uniformed Division under 3 U.S.C. § 202, which provides that, subject to the supervision of the Secretary of the Treasury, the Division shall perform "such duties as the Director, United States Secret Service, may prescribe in connection with the protection of the following . . . (4) foreign diplomatic missions located in the metropolitan area of the District of Columbia; . . . and (8) foreign diplomatic missions located in such areas in the United States, its territories and possessions, as the President, on a case-by-case basis,

219

may direct. The members of such force shall possess privileges and powers similar to those of the members of the Metropolitan Police of the District of Columbia."

This statute first extended protection to diplomatic missions in 1970, in response to concern that the Metropolitan Police were providing inadequate protection against ordinary crime. Pub. L. No. 91-217, 84 Stat. 74. *See generally* S. Rep. No. 659, 91st Cong., 2d Sess. (1970). The extent of the "protection" that may be afforded is otherwise undefined in the legislative history. The ordinary meaning of the term suggests safeguarding the premises against damage or theft, and the personnel against assaults. The duty imposed on the United States by the Vienna Convention to protect mission premises even after the recall of the personnel strongly suggests that the Secret Service's duties do not end with the sealing of a mission. Where recall is temporary, as here, there presumably must be a mission to which the personnel may return when relations improve. Thus, the Service has present duties to protect Iranian diplomatic property against third parties. These duties will extend to the consulates, however, only if the President so directs the Service.

More difficult questions surround the power of the Service regarding nondiplomatic persons who assert the permission of the sending state to enter. Here, because the President has sole power to determine what governments and ministers are to be recognized, we believe there is implied power for the President to direct the Service to forbid access to those not currently recognized as accredited diplomatic personnel to ensure that only those having diplomatic business with the embassy have access to it.

Under 18 U.S.C. § 970, damage or unauthorized occupancy of a diplomatic mission is a crime.[17] This provision, passed in response to terrorism at the Munich Olympics and elsewhere, is part of the "Act for the Prevention and Punishment of Crimes Against Internationally Protected Persons," Pub. L. No. 94-467, 90 Stat. 1997. This statute

---

[17] (a) Whoever willfully injures, damages, or destroys, or attempts to injure, damage, or destroy, any property, real or personal, located within the United States and belonging to or utilized or occupied by any foreign government or international organization, by a foreign official or official guest, shall be fined not more than $10,000, or imprisoned not more than five years, or both.

  (b) Whoever, willfully with intent to intimidate, coerce, threaten, or harass—

    (1) forcibly thrusts any part of himself or any object within or upon that portion of any building or premises located within the United States, which portion is used or occupied for official business or for diplomatic, consular, or residential purposes by—

      (A) a foreign government, including such use as a mission to an international organization . . . ;

    (2) refuses to depart from such portion of such building or premises after a request—

      (A) by an employee of a foreign government or of an international organization, if such employee is authorized to make such request by the senior official of the unit of such government or organization which occupies such portion of such building or premises; . . .

    (D) by any person present having law enforcement powers;

shall be fined not more than $500 or imprisoned not more than six months, or both.

surely provides authority for measures designed to protect the embassy against entry by anyone who has no permission from the government of Iran. Whether this ban can include those purportedly authorized access by the Iranian government but not recognized as accredited personnel by the United States may be less clear. Section 970 refers to 18 U.S.C. § 1116(b) for its definition of the foreign government whose premises are protected, and includes countries "irrespective of recognition by the United States." The foreign officials entitled to demand that unauthorized persons depart the premises are defined, however, as those "duly notified to the United States as an officer or employee of a foreign government." 18 U.S.C. § 1116(b)(3)(B). Thus, the statute appears not to authorize unaccredited foreign persons to demand the exit of others from diplomatic premises. When the accredited personnel have been expelled, this definition implies added scope to the authority under § 970(b)(2)(D) of "any person present having law enforcement powers" to order departure from the mission as necessary.

This federal statute was not meant to "relieve any person of any obligation imposed by any law of any state, . . . or the District of Columbia." H.R. Rep. No. 1614, 94th Cong., 2d Sess. 8 (1976). Because this statute was explicit in its refusal to preempt local criminal law, the Secret Service and the Metropolitan Police should have powers so conferred available to them. *See Fatemi* v. *United States,* 192 A.2d 525 (D.C. Ct. App. 1963) (holding that Iranian students occupying the embassy against the wishes of the Minister could be convicted of "unlawful entry" under the D.C. Code).

Finally, we believe that the Federal Bureau of Investigation (FBI) may participate in controlling access to diplomatic property under its general enabling authority, 28 U.S.C. § 533:

> The Attorney General may appoint officials—
> (1) to detect and prosecute crimes against the United States;
> (2) to assist in the protection of the person of the President; and
> (3) to conduct such other investigations regarding official matters under the control of the Department of Justice and the Department of State as may be directed by the Attorney General. . . .

The presence of 18 U.S.C. § 970, making unauthorized entries into diplomatic property a federal crime, is sufficient to invoke FBI jurisdiction under § 533(1).

We would add that because actions taken to carry out the President's order for diplomats to leave this country are incident to an exercise of his constitutional power, they neither rely on statutory authority for direct support nor are subject to the restrictions of the Posse Comitatus

Act, 18 U.S.C. § 1385, which generally restricts the use of Army or Air Force personnel to enforce civilian criminal law. In addition, 18 U.S.C. § 1116(d) specifically permits the use of military personnel from all the Armed Forces to enforce 18 U.S.C. § 970. Thus, we believe that the President is entitled to call on the full range of his resources in the Executive Branch to achieve the objectives discussed herein. In addition, § 1116(d) permits the President to draw on the resources of state or local law enforcement agencies in this situation.

### III. The Due Process Clause of the Fifth Amendment

The final question presented by the expulsion of foreign diplomatic personnel from the country is whether the Due Process Clause of the Fifth Amendment requires that any kind of process be observed prior to their expulsion. This Office has previously taken the position that foreign diplomatic personnel derive their legal rights from their status as diplomats under international law. We believe the Due Process Clause is implicated, if at all, only with regard to the determination whether a person about to be forcibly expelled from the United States pursuant to an order of the President is in fact the person the President ordered to be expelled. Pursuant to our meeting of March 28, 1980, with representatives of the Department of State, we understand that a procedure reasonably calculated to ensure expulsion only of those persons previously ordered to be expelled by the President will be utilized. In these circumstances, we believe that the Due Process Clause, if applicable at all, would be fully satisfied and therefore we pretermit further discussion of that issue.[18]

JOHN M. HARMON
*Assistant Attorney General*
*Office of Legal Counsel*

---

[18] An issue related to the question of the applicability of the Constitution to the forcible ejection of a foreign diplomat from the United States is the extent to which the order of the President would be subject to judicial review. Because a foreign diplomat being forcibly ejected would arguably be in the "custody" of the President's agents who were carrying out the President's order to depart, there might be a colorable claim that a writ of habeas corpus pursuant to 28 U.S.C. § 2241(c)(4) would be available. Under our analysis above, we believe that the only claim upon which a writ of habeas corpus could even arguably be granted in this situation would be a claim that the person bringing the action is not in fact the same person as the foreign diplomat ordered to leave the country by the President. As indicated above, a procedure designed reasonably to ensure that such a mistake is not made should reduce litigation risks to the minimum.

222