Ali FATEMI, Appellant,

v.

UNITED STATES, Appellee.

Jahnsojz GHARIB, Appellant,

v.

UNITED STATES, Appellee.

Iraj DEHGHAN, Appellant,

v.

UNITED STATES, Appellee.

Joussef TARASSOLI, Appellant,

v.

UNITED STATES, Appellee.

Amir Shahpour VAZIRI, Appellant,

v.

UNITED STATES, Appellee.

Ahmad Alek MOHAMMADI, Appellant,

v.

UNITED STATES, Appellee.

Ali Ashgar SHALFOROOSH, Appellant,

v.

UNITED STATES, Appellee.

Faramarz SAIFPOUR, Appellant,

v.

UNITED STATES, Appellee.

Fereidon GOOLEH, Appellant,

v.

UNITED STATES, Appellee.

Hamid Parach MONAZAH, Appellant,

v.

UNITED STATES, Appellee.

Ardalam FARAJALLAH, Appellant,

v.

UNITED STATES, Appellee.

Ahmad LARIZADEH, Appellant,

v.

UNITED STATES, Appellee.

Parviz AMERI, Appellant,

v.

UNITED STATES, Appellee.

Mohammad Hashem LASHKARI, Appellant,

v.

UNITED STATES, Appellee.

Nos. 3263–3276.

District of Columbia Court of Appeals.

Argued June 3, 1963.

Decided July 12, 1963.

Rehearing Denied July 30, 1963.

Lawrence C. Moore, Washington, D. C., for appellants.

Max Frescoln, Asst. U. S. Atty., with whom David C. Acheson, U. S. Atty., Frank Q. Nebeker and William W. Greenhalgh, Asst. U. S. Attys., were on the brief, for appellee.

Before HOOD, Chief Judge, and QUINN and MYERS, Associate Judges.

MYERS, Associate Judge.

These are consolidated appeals of fourteen Iranian nationals from convictions for "unlawful entry" under Title 22 D.C.Code § 3102, 1961 Ed.[1]

Appellants, Iranian students studying in this country, entered the Iranian Embassy to deliver a petition protesting an Iranian land reform referendum.[2] After they had staged an overnight "sleep-in," embassy officials requested the Metropolitan police to come to the embassy. Several police officers, headed by a captain, entered the embassy and talked with the Minister who gave the captain a formal, written request addressed to the Metropolitan Police Department asking the police to enter the em-

---

1. Title 22, District of Columbia Code, Section 3102, provides:

   "Unlawful entry on property

   "Any person who, without lawful authority, shall enter, or attempt to enter, any public or private dwelling, building or other property, or part of such dwelling, building or other property, against the will of the lawful occupant or of the person lawfully in in charge thereof, or being therein or thereon, without lawful authority to remain therein or thereon shall refuse to quit the same on the demand of the lawful occupant, or of the person lawfully in charge thereof, shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine not exceeding $100 or imprisonment in the jail for not more than six months, or both, in the discretion of the court."

2. Two of the appellants, by affidavits attached to motions for "acquittal," or, for a new trial, claimed to have been at the embassy only for the purpose of having their passports renewed. This information was never offered by them during trial and, being available to them, was therefore not a basis for either an acquittal or for a new trial.

bassy, eject the students from the premises and arrest them because, after a lawful entry on the previous day, they had refused to leave upon demand of the person lawfully in charge. The Minister then, in the presence of the police, again asked the students to leave within five minutes, addressing them in both Iranian and English. When they refused to depart they were placed under arrest and bodily carried from the embassy.

Following trial on January 22, 1963, the defendants, having refused a continuance and having chosen not to testify, but at all times fully represented by counsel, were found guilty.

Appellants complain numerous errors were committed below. We are of the opinion that only two alleged errors are worthy of consideration: (1) that the District of Columbia police had no authority to enter the Iranian Embassy and arrest Iranian nationals for a crime committed within the confines of the Embassy; and (2) even if the inviolability of the Embassy could be waived, the Minister had no authority to waive it. Appellants contend that a foreign embassy, protected by the doctrine of inviolability, which extends to diplomatic dwellings, is not subject to the jurisdiction of the local police and courts of the receiving state or to its body of criminal law. We find scant authority to support this contention; indeed the weight of authority is to the contrary.

Since our decision must rest in part upon principles of international law, which is part of the law of the land,[3] we have examined custom, case decisions and the works of the treatise writers to aid in ascertaining the nature of the particular questions here involved. Although case law is not controlling in determining issues of international law, recorded decisions help in analyzing the custom or trend of the law in a given area. We believe that the weight of international case law[4] as reinforced by the treatise writers[5] establishes as a modern rule of international law that (1) a foreign embassy is not to be considered the territory of the sending state; and (2) local police have the authority and responsibility to enter a foreign embassy if the privilege of diplomatic inviolability is not invoked when an offense is committed thereon in violation of local law.

Representatives of a foreign sovereign are given immunity from the operation of the laws of the receiving nation, and the premises and buildings occupied by the diplomatic mission usually are regarded as inviolable by the authorities of the receiving state. This is grounded upon the international law concept that all sovereigns are equal and that the representatives of a particular sovereign serve in the place of the one sending them. "No act of jurisdiction or administration of the receiving Government can take place within [the

3. The Paquete Habana, 175 U.S. 677, 700, 20 S.Ct. 290, 44 L.Ed. 320; Hilton v. Guyot, 159 U.S. 113, 163, 16 S.Ct. 139, 40 L.Ed. 95.

4. The following are some cases which have involved the concept of extraterritoriality: Trenta v. Ragonesi, Foro 1935, I, 1725; Ministere public v. Dame venue Pacory, Dalloz Hebd. 1934, p. 367; Afghan Embassy Case, Annual Digest, 1933–34, Case No. 166; In re Zoltan Sz., Annual Digest, 1927–28, Case No. 252.

5. A few selections from the treatises disclose:

(a) " * * * If a crime is committed inside the house of an envoy by an individual who does not enjoy personally the privilege of extraterritoriality, the criminal must be surrendered to the local Government." 1 Oppenheim, International Law (8th Ed. Lauterpacht Editor 1955) § 390.

(b) "The inviolability of diplomatic premises does not mean that they are to be considered as altogether outside the application of the law of the receiving state—a foreign enclave within its territory." Brierly, The Law of Nations (6th Ed. 1963).

confines of an embassy] *except by special permission of the envoys."*[6] (Emphasis added.)

That the diplomatic premises are a part of the territory of the sending state and therefore *always* exempt from local laws does not follow as a matter of course, however. "The modern tendency among writers is toward rejecting the fiction of extraterritoriality * * *"[7] Numerous case decisions bear out this trend. As early as 1867, the doctrine of extraterritoriality was abandoned by European nations. Recently, in the case of R. v. Kent,[8] the British courts held that "A crime committed in a foreign embassy is a crime committed in the United Kingdom and the offender, *if not protected by diplomatic immunity*, is liable to prosecution in British courts." (Emphasis added.)

■■ Appellants have failed to distinguish cases in which the privilege of diplomatic immunity is invoked from those in which it is not. If a member of the diplomatic community asserts his claim to immunity, then the local police are powerless to act. Only if the criminal act being committed by the diplomat is such as to endanger the public may the police disregard the inviolability of an embassy and enter to seize the offender. Even in this situation the police may only hold the accused to prevent injury to the public, and only until the Department of State can request his recall, but the law enforcement officers are powerless to prosecute the offender. Such is not the instant case, involving an embassy to which the police had been invited in order to arrest and remove Iranian students who have no claim to the privilege of immunity and were violating local law.

Appellants' next contention—that even if the inviolability of the diplomatic dwellings can be waived, the Minister of the embassy had no authority to do so—that the waiver must come only from the Ambassador—is equally without merit.

■ "The collective will of a state is, and must be, exercised through the individuals who act as its agents * * *"[9] We do not think it unreasonable to hold that a police captain can enter the Iranian embassy and make an arrest for a misdemeanor committed in his presence when he has been called by one who purports to be the Minister of the embassy and is given a letter on official Iranian stationery asking the local police to disregard, for this one instance, the diplomatic rule of inviolability of the embassy and to lend aid in the ejection of violators. There can be no doubt that the Minister intended to renounce the privilege of immunity of the Embassy. The silence of the Ambassador following the arrests would appear in itself a sufficient ratification (if required) of the act of his agent, the Minister. From the point of view of the police and the courts of the United States, the country to which he is accredited, his action must be regarded as legal.[10]

■ Appellants also complain of error in not granting their motion for a new trial. It has been stated many times previously that the granting of such motion is within the sound discretion of the trial court, and we have no authority to review unless there be manifest abuse of that discretion.[11] We have examined the record and find no abuse. Other errors claimed are without merit.

6. 1 Oppenheim, supra, n. 5.

7. Id. § 389, footnote 3.

8. R. v. Kent (or A.B.), 1 K.B. 454 (1941).

9. Eagleton, The Responsibility of States in International Law, Sec. 13, (1928).

10. See Procureur du Roi c. Hier Chung et consorts, Annual Digest, 1929–30, Case No. 200.

11. Tillman v. United States, D.C.Mun. App., 96 A.2d 272, 273 (citing Battle v. United States, 92 U.S.App.D.C. 220, 206 F.2d 440).

Accordingly, we rule that the arrest of the appellants was neither arbitrary nor illegal but orderly and proper under the circumstances, and there being no error concerning the trial, the convictions are

Affirmed.