Marcy G. SMITH, Appellant,

v.

UNITED STATES, Appellee.

Liz C. REILEY, Appellant,

v.

UNITED STATES, Appellee.

Nos. 13790, 13791.

District of Columbia Court of Appeals.

Argued En Banc Sept. 30, 1981.

Decided May 3, 1982.

Charles W. Halleck, Washington, D. C., appointed by the court, for appellants.

John R. Fisher, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., Washington, D. C., at the time the case was argued, Earl J. Silbert, U. S. Atty., Washington, D. C., when the original brief was filed, and John A. Terry, John Brooks Harrington, and E. Anne McKinsey, Asst. U. S. Attys., Washington, D. C., were on the briefs, for appellee.

Before NEWMAN, Chief Judge, and KELLY, KERN, NEBEKER, HARRIS,[*] MACK, FERREN, PRYOR and BELSON, Associate Judges.

NEBEKER, Associate Judge:

Appellants were convicted of violating the unlawful entry statute, D.C.Code 1973, § 22-3102, based upon their refusal to desist from conducting a demonstration on the White House grounds. Appellants challenge their convictions on the grounds that (1) the informations charging the offense were fatally defective, and (2) the application of the unlawful entry statute under this case is precluded by the First Amendment of the United States Constitution. We affirm the convictions.

I

On April 18, 1978, Officer Thomas Brady of the United States Secret Service Uniformed Division was assigned to a post at the East Gate of the White House, through which tourists routinely enter. At about

---

[*] *Associate Judge* HARRIS did not participate in the disposition of this appeal. He retired from this court effective February 5, 1982.

11:00 a. m., a tourist informed Officer Brady that there was some sort of demonstration going on inside the White House grounds. He investigated the report, and observed four women, including appellant Reiley, lying on a slate patio just to the side of the tour line, approximately 50 feet inside the fence to the right of the east portico. The women were lying in puddles of what appeared to be a mixture of ashes and water. Those puddles had not been on the slate earlier in the day. Appellant Smith was standing near the prone women, addressing other tourists as they passed.

Officer Brady did not know for what cause the demonstration was being staged, but upon approaching appellant Smith he heard her make reference to "[n]uclear weapons or something like that." The officer asked the demonstrators to leave, and informed them that their refusal would subject them to arrest under the unlawful entry statute. He repeated this advice, but received no response from any of the demonstrators. Thereafter, the women additionally were informed in turn by three senior Secret Service officers who were summoned to the scene—Sergeant Elexia, Lieutenant Campbell, and finally Lieutenant Jenkins—that they would be arrested if they did not leave. When appellants and their three companions ignored the repeated warnings, the officers ultimately closed off the tourist line and arrested the five demonstrators.

After waiving a jury trial, appellants were tried together; the trial judge found them guilty.

## II

Appellants first contend that the government failed either to charge or to prove a

violation of the unlawful entry statute because Officer Brady was not "the person lawfully in charge" of the White House tour area on the day of the arrests.[1] The amended informations charged appellants with:

> Unlawful entry, in that without lawful authority [they] remained upon certain property consisting of 1600 Pennsylvania Avenue, Northwest, against the will of Thomas Brady, the person lawfully in charge thereof, after having been given notice to leave.[2]

Appellants argue that it was Lieutenant Jenkins, not Officer Brady, who was "lawfully in charge" of the Executive Mansion on that day. This being so, they argue, Officer Brady had no authority under the statute to order appellants to leave the area in which they were demonstrating. Appellants base this contention on a memorandum issued sometime prior to January 1978 by the then-President's counsel, Robert J. Lipshutz, stating:

> You are hereby informed that the President has designated the Chief of the United States Secret Service Uniformed Division (or the person acting in that capacity) or, in his absence the senior Official of the United States Secret Service Uniformed Division on the scene, as the person lawfully in charge of the Executive Mansion and grounds, and any other building in which the White House Offices are located, for the purposes of Title 22, Section 3102 of the Code of Laws of the District of Columbia. [Defendants' Exh. 1, R. 9]

When the incident occurred, Lieutenant Jenkins was the senior officer on duty at

---

1. The statute, D.C.Code 1973, § 22–3102, provides in pertinent part:

   Any person, who, without lawful authority, shall enter, or attempt to enter, any public or private dwelling, building or other property, or part of such dwelling, building or other property, against the will of the lawful occupant or of the person lawfully in charge thereof, or being therein or thereon, without lawful authority to remain therein or thereon shall refuse to quit the same on the demand of the lawful occupant, or of the person law-

fully in charge thereof, shall be deemed guilty of a misdemeanor . . . .

2. The informations originally listed Lieutenant Campbell as the person "lawfully in charge" of the White House whose order to leave was disregarded by appellants. At the beginning of the trial, the informations were amended to substitute Officer Brady for Lieutenant Campbell as the person lawfully in charge. Appellants do not contend that they were prejudiced by the amendment of the informations. *See* Super.Ct.Cr.R. 7(e).

the White House—the "Watch Commander," in the parlance of the Secret Service. Appellants claim that their convictions under § 22–3102 were invalid because the informations listed Officer Brady as the person lawfully in charge, even though he was not the Watch Commander at the time the demonstrators were asked to leave. In effect, appellants suggest that the Watch Commander, who is responsible for the overall security operations for the entire White House complex, must leave his post and appear personally to warn any disorderly person, whether or not that person is engaged in any sort of protest or demonstration, that he must leave.

Appellants' argument is inconsistent with both the plain language of the Lipshutz memorandum and our decision in *Whittlesey v. United States*, D.C.App., 221 A.2d 86 (1966). The Lipshutz memorandum provides that in the absence of the Watch Commander, the person "lawfully in charge" of the White House grounds for purposes of § 22–3102 is "the senior Official of the United States Secret Service Uniformed Division on the scene . . . ." Both Captain Elgin and Lieutenant Jenkins of the Secret Service testified that for practical reasons, the first officer to arrive at the scene of a disturbance or demonstration regularly is considered to be the senior officer "on the scene" for purposes of giving a notice to quit and making the decision to enforce the unlawful entry statute. It understandably is not the practice of the Secret Service to require the Watch Commander to appear and individually to enforce the statute in every instance of a potential disturbance. We agree with the government that it would be unreasonable, within a complex as large as the grounds of the Executive Mansion, to require that only the senior officer on duty is empowered to enforce § 22–3102.

■■ The government's position is supported firmly by our ruling in *Whittlesey, supra*. In that case, we rejected the argument that only the President could order demonstrators to leave the White House under the statute. Although the issue in *Whittlesey* was whether the Commanding Officer of the White House Police (then the functional equivalent of the present Watch Commander in the Secret Service) had authority under § 22–3102 to give demonstrators a notice to quit, we see no reason to limit *Whittlesey* narrowly to its facts. As we then stated, "[i]t would be highly unreasonable to hold that in a public building there is only one person, the one with senior authority, who is lawfully in charge." 221 A.2d at 89. The court went on to reason that "a person may be lawfully in charge even though there are other persons who could, if they choose to do so, countermand or override his authority, and that with respect to given premises, there may be more than one person who has the authority to order a removal." *Id.* at 91. Cf. *Fatemi v. United States*, D.C.App., 192 A.2d 525, 528 (1963), aff'd (D.C.Cir., No. 18043, Mar. 24, 1964), cert. denied, 377 U.S. 997, 84 S.Ct. 1916, 12 L.Ed.2d 1048 (1964) (embassy minister, as agent of ambassador, had authority to permit District of Columbia police to enter embassy and to arrest foreign nationals). We conclude that the senior Secret Service officer on the scene is empowered as the lawful occupant to demand that appellants quit the premises—the White House grounds. Since Brady was considered to be the senior officer on the scene, the informations properly charged appellants with violations of § 22–3102.

## III

■ A more sensitive issue is presented by appellants' claim that their arrests and convictions were inconsistent with the First Amendment of the Constitution. At the heart of their argument is the well-established rule that the government may regulate speech and communicative conduct on public property only in a narrow and reasonably necessary manner which serves significant government interests. *See, e.g., Grayned v. Rockford*, 408 U.S. 104, 115, 92 S.Ct. 2294, 2302, 33 L.Ed.2d 222 (1972); *Cox v. Louisiana*, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); *Edwards v. South Carolina*, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963). Any regulation impinging upon

such activity must be content-neutral and nondiscriminatory. *See United States Postal Service v. Council of Greenburgh Civic Associations,* 453 U.S. 114, 101 S.Ct. 2676, 2686, 69 L.Ed.2d 517 (1981); *Police Department of Chicago v. Mosley,* 408 U.S. 92, 95–96, 92 S.Ct. 2286, 2289–90, 33 L.Ed.2d 212 (1972); *Cox, supra,* 379 U.S. at 555–56, 85 S.Ct. at 464–65; *Leiss v. United States,* D.C.App., 364 A.2d 803, 807–08 (1976), *cert. denied,* 430 U.S. 970, 97 S.Ct. 1654, 52 L.Ed.2d 362 (1977). Factors to be weighed in determining the reasonableness of any restrictions infringing upon free expression include "the nature of the particular public property, the weight of the governmental interests involved, the availability of alternative avenues of expression, and the extent to which the regulation unnecessarily interferes with First Amendment rights." *Leiss v. United States, supra,* at 808.

Appellants point out that when they were arrested, they were in an area of the White House which was open to the public during regular visiting hours. Their demonstration was peaceful and had not impeded the orderly flow of tourist traffic (although during appellants' arrests the Secret Service stopped the tourist line temporarily). Similarly, there was no indication that appellants' activities were likely to incite other tourists to violence or to endanger the safety of the President or the First Family. For those reasons, and because their activities were "communicative" in nature, appellants contend that their arrests "constituted an impermissible discriminatory, content-related *ad hoc* regulation of free speech beyond that reasonably required by the circumstances."

■ Appellants' argument has facial appeal and might well be persuasive if we were dealing with almost any other form of public property. The unique nature of the grounds of the Executive Mansion, however, justifies more stringent regulation of

conduct within the White House complex than would be tolerated on most other government properties. In *Leiss v. United States, supra,* a case factually similar to the instant controversy, we recognized these special considerations:

> Unrestricted access to the White House obviously is incompatible with its character and functions. The White House fulfills significant governmental, public, and private functions which make it far more than a symbol of the executive branch of government toward which individual grievances legitimately may be directed. It serves as an office complex for the President and much of his staff, requiring order and efficiency for the day-to-day performance of vital and often sensitive administrative activities; as a public museum, requiring the maintenance of the degree of safekeeping and decorum to which our national heritage is entitled; and as a home for the First Family, requiring the provision of a private refuge from the rigors of public life and an unfailing vigilance against the acts of potentially violent individuals. [364 A.2d at 808.]

Appellants argue that they were no different from other tourists except for the fact that appellant Reiley laid down on the ground and appellant Smith addressed other tourists as they passed.[3] They contend that their conduct did nothing to impact adversely upon the governmental functions described in *Leiss.*

■ We cannot agree that the Secret Service must wait until a demonstration at the White House becomes violent or boisterous before steps are taken to curb it. Protests and politically motivated demonstrations inherently involve some degree of controversy. When controversy is flaunted before a large captive audience, there is always a chance for violence or unrest, however slight.[4] The officers of the Secret

---

**3.** Captain Elgin of the Secret Service testified that tourists are allowed to move through the tour at their own paces; they may move faster or more slowly than other tourists in the line, and they may stop and rest during the tour if they wish to do so.

**4.** Captain Elgin stated that based on his experience over the years, he would recommend halt-

Service have a duty to preserve the safety of all of those within the White House complex, from the President to the thousands of tourists who pass through the mansion. *See* 18 U.S.C. § 3056 (1976). They also are charged with administrative functions, one of which implicitly is to see that the tour line is maintained in a routine and orderly fashion during visiting hours. *See* 3 U.S.C. § 202 (1976). When conduct such as appellants' requires that even one or two Secret Service officers be diverted from their usual posts to insure that no disruptive activity ensues, the normal White House routine is disturbed. In this light, we do not consider it to be unreasonable for the Secret Service to limit the public's access to the White House solely to the purpose of touring through portions of the Executive Mansion. As we stated in *Leiss, supra*, "[t]he Secret Service and the Executive Protective Service should not be expected to formulate day-by-day changes in their protective procedures to accommodate all those who wish to make the White House their personal forum." 364 A.2d 808. The Supreme Court squarely has rejected the notion "that people who want to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please." *Adderley v. Florida*, 385 U.S. 39, 48, 87 S.Ct. 242, 247, 17 L.Ed.2d 149 (1966); *accord, Heffron v. International Society for Krishna Consciousness, Inc.*, 452 U.S. 640, 101 S.Ct. 2559, 2563, 69 L.Ed.2d 298 (1981). *Cf. United States Postal Service v. Council of Greenburgh*

*Civic Associations, supra*, 101 S.Ct. at 2685 ("the First Amendment does not guarantee access to property simply because it is owned or controlled by the government"). *See also Cox v. Louisiana, supra*, 379 U.S. at 554–55, 85 S.Ct. at 464–65. It is the policy of the Secret Service to prohibit any form of demonstration within the interior grounds of the White House, regardless of the nature of the message sought to be conveyed.[5] This policy reflects the Secret Service's protective duties and its concern for security, as well as a desire to maintain the dignity and aesthetic grandeur of the Executive Mansion. Appellants have failed to show that enforcement of the unlawful entry statute against them was in any way content-based, or that the statute was applied to them in other than an even-handed fashion.

We take note of this policy, not because as unpublished (Ferren, J., dissent at p. 974) it has any proscriptive weight, but simply to show that enforcement of the unlawful entry statute by the White House security people is reasonable and not content oriented. No doubt it would have been easier for any of us to decide this case if a public notice proscribed a concerted water and ashes exercise (Ferren, J., dissent at p. 975, n.9). On the other hand, it is hardly sensible to weave into our jurisprudence the notion that such an exercise when coupled with a refusal to desist and leave is not proscribed by the unlawful entry statute above.[6]

ing the tour line whenever any demonstration occurs at the White House, because "[y]ou don't know the potentiality of the people." He also felt that in the past, there had been too many instances in which the Secret Service had underreacted, rather than overreacted, to situations involving demonstrators.

**5.** Captain Elgin testified that although there is no precise definition of the word "demonstration," "I don't think you would have any problem in deciding from the officers what a demonstration is . . . . [A]nything out of the normal of the tourists coming here to see the White House, we would investigate."

The Secret Service formerly tolerated limited peaceful demonstrations inside the White House grounds during visiting hours. The practice was abandoned in January 1978, when

the Chief of the Uniformed Division announced a new policy prohibiting all demonstrations within the grounds. [*See* Defendants' Exh. 2, R. 10]

**6.** We have not held in *Leiss, supra*, and *Carson v. United States*, D.C.App., 419 A.2d 996 (1980), that "in order to justify a conviction . . . due process requires notice of specific, prohibited conduct . . . ." (Ferren, J., dissent at p. 972). *Leiss* was an after-hours request to leave situation and *Carson* simply noted that absence of legal authority to engage in conduct —"lack of right to be there," *id.* at 998—may be noted in a number of different ways, at least one of which was evident from the record. We did not hold that due process requires "notice of specific, prohibited conduct" in the sense that Judge Ferren envisions.

Appellants' arrests might well have been susceptible to charges of unreasonableness had they occurred on government property other than the interior of the White House grounds—*e.g.,* on the steps of the United States Capitol [*see United States v. Nicholson,* D.C.App., 263 A.2d 56 (1970) (per curiam), *aff'd, United States v. Nicholson,* D.C.Ct.Gen.Sess., 97 Wash.D.L.Rep. 1213 (1969)], on the sidewalk in front of the Supreme Court [*see Grace v. Burger,* 665 F.2d 1193 (D.C.Cir.1981) (Notice of Appeal filed December 11, 1981)] or on the sidewalk just outside the White House fence [*see A Quaker Action Group v. Hickel,* 137 U.S.App.D.C. 176, 421 F.2d 1111 (1969)]. Once inside the gates, however, "the complex and elaborate security precautions" which are indispensable at the White House provided a governmental interest sufficient to outweigh appellants' rights to express a form of protest. *See Leiss, supra,* 364 A.2d 808.

■ It is arguable that appellant Smith's conduct, by itself, did not provide an adequate ground for invocation of the unlawful entry statute, inasmuch as she stood to the side of the line and directed political remarks to tourists as they passed. However, there is no doubt that she acted in concert with appellant Reiley and the three other women who were lying on the patio in puddles of ashes and water. Their collective efforts resulted in an activity which clearly was out of the ordinary for the tour area, and which quite conceivably could have led to disruptive reactions by tourists with opposing views. Thus, while we by no means wish to imply that a person leaves all First Amendment protections behind when

he passes through the White House gates, we nevertheless conclude that the Secret Service did not act impermissibly with respect to appellants.

Our conclusion on this issue is bolstered by the fact that appellants had at their ready disposal equally effective alternative means of communicating their message. Appellants easily could have conveyed their opinions to other tourists from the sidewalk outside the East Gate of the White House. If their objective was to reach the President with their thoughts, there were considerably more legitimate avenues of petition available through which they would be more likely to gain his attention.

■ Finally, appellants urge a void-for-vagueness argument based on a January 1978 Secret Service internal memorandum concerning procedures for handling demonstrators at the White House.[7] That memorandum, issued by the Chief of the Secret Service Uniformed Division, instructs members of that force to arrest any persons involved in a demonstration or "sit-in" who refuse to leave after being requested to do so. Appellants' complaint is that the meaning of the word "demonstration" is nowhere defined.[8] This they contend, means that enforcement of the unlawful entry statute is left to the "standardless, discretionary decision of an officer on the scene."

Appellants' vagueness argument is a specious one, for it is raised inappropriately.[9] It is not within the province of this court to declare facially unconstitutional an internal agency memorandum that has no force or effect of law and which has not been made available to the general public. We properly may decide only whether application of

---

7. Appellants do not challenge the unlawful entry statute as vague on its face. They concede that the statute's constitutionality was settled conclusively in *Leiss v. United States, supra,* at 806–08.

8. *See* note 5, *supra.*

9. Even if we appropriately could rule on this issue, it is doubtful that we would find the term "demonstration" unconstitutionally vague. A similar challenge has been rejected by the United States District Court for the District of Columbia. *See Culver v. Secretary of the Air*

*Force,* 389 F.Supp. 331, 332–34 (D.D.C.1975), *aff'd,* 182 U.S.App.D.C. 1, 559 F.2d 622 (1977) (Air Force regulation stating that "Members of the Air Force are prohibited from participating in demonstrations when ... [i]n a foreign country" is not constitutionally vague). Judge Ferren would go further, finding the term sufficiently understandable to be precise. Thus, we seem inescapably to have forecast a holding that a simple proscription of "demonstrations" within the White House grounds could solve the problems presented to us in these cases.

the unlawful entry statute to appellants under the facts of this case was consistent with the First Amendment. *See Broadrick v. Oklahoma*, 413 U.S. 601, 610–11, 93 S.Ct. 2908, 2914–15, 37 L.Ed.2d 830 (1973) (improper to challenge statute on the ground that it may be applied unconstitutionally to someone else); *see also Parker v. Levy*, 417 U.S. 733, 756, 94 S.Ct. 2547, 2561, 41 L.Ed.2d 439 (1974). As the government points out in one of its briefs, this court "need not speculate as to whether a wholly different set of circumstances might have resulted in a different response from the Secret Service officers, merely because they could not articulate a universally applicable definition of 'demonstration.'" *See Leiss, supra*, 364 A.2d at 807 & n.4.

We conclude that appellants' arrests and convictions did not constitute unreasonable restraints on the exercise of their First Amendment rights. The judgments of the trial court accordingly are affirmed.

*Affirmed.*

NEWMAN, Chief Judge, with whom MACK, Associate Judge, joins, dissenting:

This case presents the issue of whether the unlawful entry statute is void for vagueness as applied to appellants.[1] I agree with Judge Ferren that the appellants were not provided with fair notice of the prohibition against "demonstrations" as required by the due process clause. I dissent separately because, even if a posted sign had announced this "demonstration" ban, it permits a greater degree of police discretion than is constitutionally allowable.

I

The unlawful entry statute prohibits the act of remaining on White House property only when such conduct is both without lawful authority and against the expressed will of the person lawfully in charge of the premises. *Leiss v. United States*, D.C.App., 364 A.2d 803, 806 (1976), *cert. denied*, 430

U.S. 970, 97 S.Ct. 1654, 52 L.Ed.2d 362 (1977). Persons may not be lawfully ejected from the White House grounds "on the order of the person lawfully in charge *absent some additional, specific factor establishing their lack of a legal right to be there." Carson v. United States*, D.C.App., 419 A.2d 996, 998 (1980) (emphasis added).

This "additional specific factor" requirement serves an important purpose. It guarantees that a valid arrest and conviction does not rest solely on the refusal of a person to comply with a police officer's order to leave under the general authority of the unlawful entry statute. Rather, an individual must violate a known, independent, and objective standard of conduct to be subject to lawful expulsion from the White House grounds. Were it otherwise, the statute might well constitute an unconstitutional delegation of unbridled discretion to law enforcement officials. *See Smith v. Goguen*, 415 U.S. 566, 573, 575–76, 94 S.Ct. 1242, 1247, 1248, 39 L.Ed.2d 605 (1974); *Coates v. City of Cincinnati*, 402 U.S. 611, 614, 91 S.Ct. 1686, 1688, 29 L.Ed.2d 214 (1971); *Gregory v. City of Chicago*, 394 U.S. 111, 120, 89 S.Ct. 946, 951, 22 L.Ed.2d 134 (1969) (Black, J., concurring); *Shuttlesworth v. City of Birmingham*, 382 U.S. 87, 90, 93, 86 S.Ct. 211, 213, 214, 15 L.Ed.2d 176 (1965).

The presence of an "additional specific factor" served as a basis for our upholding the constitutionality of arrests and convictions for unlawful entry in other cases involving political expression on the White House grounds. In *Leiss v. United States, supra*, Leiss was lawfully arrested and convicted because he remained on the grounds past the noon closing hour. Not only was this in violation of an officer's request to leave the premises, but Leiss' conduct was prohibited by the "additional specific factor" of posted regulations restricting visiting hours. In *Carson v. United States, supra*, the "additional specific factor" was a

---

1. The majority avoids reaching the vagueness challenge by falsely characterizing appellants' case as a facial challenge to the unlawful entry statute. Yet, appellants clearly contend that the statute is void for vagueness as applied to their conduct. Appellants' Supplemental Brief pp. 10–22.

chain which clearly marked off that portion of the lawn allowed for tourist use from unauthorized portions. Carson was lawfully arrested and convicted because, independent of the officer's request for Carson to leave the unauthorized area, he remained on the unauthorized portion of the lawn. In each case, not only was the "additional specific factor" clearly posted and marked, thereby providing adequate notice of prohibited conduct, but the factor was so objective in nature so as not to force private persons or police officers to guess as to its meaning.

## II

In this case, the additional specific factor which deprived appellants of a legal right to remain on the White House grounds is an unpublished internal agency memorandum prohibiting any form of demonstration. The unlawful entry statute's application is predicated upon the application of this memorandum. Contrary to the majority's comment that we cannot review the validity of this memorandum, we cannot uphold the application of the unlawful entry statute unless the memorandum itself can avoid the vices of vagueness. *See, e.g., United States v. Nicholson*, D.C.Ct.Gen.Sess., 97

Wash.D.L.Rep. 1213 (1969), *aff'd*, D.C.App., 263 A.2d 56 (1970), *reprinted in Dellums v. Powell*, 184 U.S.App.D.C. 275, 305–13, 566 F.2d 167, 197–205 (1977).

Yet, the terms of this memorandum are so indefinite and subjective as to invite the very caprice in official enforcement that the vagueness doctrine is designed to protect against. "Demonstrations" are prohibited,[2] but nowhere are any standards provided for an officer's interpretive discretion. As the record makes clear, whether or not a particular activity constitutes a demonstration is entirely dependent upon the idiosyncratic predelictions of the officer in charge. Indeed, Captain Elgin, a member of the Secret Service Force who enforces the unpublished demonstration memorandum, was questioned at length concerning his understanding of the standards governing enforcement. He testified that there are no written rules; that the determination of whether persons represent a potential threat to protective responsibilities is "a judgment call by the official on the scene there." To the extent there is a governing standard, it appears to be whether or not the officer in charge is annoyed by the conduct of a person in the tour line.[3]

**2.** The majority indicates that on the authority of *Culver v. Secretary of the Air Force*, 389 F.Supp. 331, 332–34 (D.D.C.1975), *aff'd*, 182 U.S.App.D.C. 1, 559 F.2d 622 (1977), the term "demonstration" is not unconstitutionally vague. *Culver*, however, involved Air Force regulations prohibiting members from participating in demonstrations in a foreign country. Thus, the court's standard of review was controlled by principles announced in *Greer v. Spock*, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976), and *Parker v. Levy*, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974), which permit Congress to legislate with more breadth and flexibility when proscribing rules for the military than when other bodies legislate civilian criminal law. Thus, the standard of review applied in *Culver* was a relaxed standard normally associated with the review of economic regulations. Where, as in this case, the demonstration memorandum is neither the act of Congress nor governs military affairs, the strict standard of review normally applied to regulations that inhibit expression or conduct sheltered by the First Amendment would apply. *See Grayned v. City of Rockford*, 408 U.S. 104, 109, 92 S.Ct. 2294, 2299, 33 L.Ed.2d 222 (1972)

(city ordinance); *Washington Mobilization Committee v. Cullinane*, 184 U.S.App.D.C. 215, 225–26, 566 F.2d 107, 117–18 (1977) (narrow specificity required of District of Columbia police line ordinance applied to civilian demonstration activities). It is well accepted that the degree of vagueness the Constitution tolerates depends in part on the nature of the enactment. *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, —— U.S. ——, —— – ——, 102 S.Ct. 1186, 1191–95, 71 L.Ed.2d 362 (1982).

**3.** I cannot accept the majority's inference that the need for security allows the officers to lawfully arrest any person engaged in any activity which is out of the ordinary for the tour area, and which "quite conceivably could have led to disruptive reactions by tourists with opposing views." *See* p. 967 *supra*. A person does not leave all First Amendment protections behind when he passes through the White House gates. Yet, the majority implies that the demonstration memo makes it legitimate to bar from the White House tour line a lone protestor wearing a political button that might offend some persons, a person reciting the Lord's

The fact that a demonstration memorandum exists distinguishes this case from the situation in which the mere whim of the officer in charge is the sole measure of a lawful arrest.[4] Reliance on this ambiguous ban on "demonstrations" does little, however, to bridle whimsical and purely discretionary decision making. The memorandum's lack of specificity leaves appellants subject to the vagaries of official interpretation. It is impossible of evenhanded, impartial application. Thus, the memo cannot save the unlawful entry statute from being unconstitutionally vague as applied to appellants.

### III

While I am mindful of the need for official discretion in order to guarantee the security of the White House grounds, I cannot accept that the Constitution permits enforcement officials to suppress political speech simply on the basis of their various interpretations of what constitutes a "demonstration." I dissent.

FERREN, Associate Judge, dissenting:

I have no quarrel with "the policy of the Secret Service to prohibit any form of demonstration within the interior grounds of the White House, regardless of the nature of the message sought to be conveyed." *Ante* at 966. Indeed, I assume the government could ban tourist traffic altogether at the White House, if that appeared necessary for any reason. My problem with the majority view, therefore, is not with proscribing the conduct at issue here.

My concern, rather, is premised on the fact that, as presently administered, the White House is to some extent a public place. Customarily, the public is welcome on White House grounds at prescribed times and in specified areas. Until recently, in fact, the government permitted peaceful speech activities there. *Ante* at 966 n.5. It follows, and our cases so hold,[1] that if "the person lawfully in charge"[2] of the White House grounds asks a public invitee to leave—at the risk of otherwise violating a criminal, unlawful entry statute—elementary due process requires notice (forewarning) of a specific reason why that visitor has no "lawful authority to remain." D.C. Code 1973, § 22–3102. Without such notice, arrests and prosecutions for unlawful entry on public property could be arbitrary—at the whim of enforcers—for the statute itself provides no standard regulating conduct. Appellants had no proper notice that what they were doing was unlawful. As a consequence, their convictions should be reversed.

To repeat: no one challenges the government's right to impose "more stringent regulation of conduct within the White House complex than would be tolerated on most other government properties." *Ante* at 965. But the majority invokes this right without dealing with the government's corresponding obligation to notify the public with sufficient clarity what the limits of permissible conduct on White House property are, so that they can conform their conduct accordingly. Under the theory of the majority, a member of the public who is welcome on White House grounds can be

Prayer, or a person passing out a handbill that contains the text of the First Amendment, any of which would be out of the ordinary tour line behavior. *See Grace v. Burger*, 665 F.2d 1193 (D.C.Cir.1981) (upholding the lawfulness of passing out handbills containing the text of the First Amendment on the sidewalk in front of the Supreme Court building). To the extent that this construction of the word "demonstration" cures vagueness, it makes the regulation unconstitutionally overbroad.

4. As Judge Ferren notes, the day has passed when the government could argue convincingly that appellants were obliged to leave the

grounds simply on the request of the officer in charge.

1. *Carson v. United States*, D.C.App., 419 A.2d 996 (1980); *Leiss v. United States*, D.C.App., 364 A.2d 803 (1976), *cert. denied*, 430 U.S. 970, 97 S.Ct. 1654, 52 L.Ed.2d 362 (1977).

2. I agree with my colleagues in the majority that for purposes of enforcing the unlawful entry statute, Officer Brady, the senior Secret Service officer on the scene, was "the person lawfully in charge." D.C.Code 1973, § 22–3102.

asked to leave—under threat of criminal prosecution—on the basis of "an internal agency memorandum that has no force or effect of law and which has not been made available to the general public." *Ante* at 967. As elaborated below, I suggest that the majority's application of the unlawful entry statute, on the basis of criteria in a secret memo, is unconstitutional. It violates due process.

## I.

In *Leiss v. United States*, D.C.App., 364 A.2d 803 (1976), *cert. denied*, 430 U.S. 970, 97 S.Ct. 1654, 52 L.Ed.2d 362 (1977), the defendant Leiss entered the White House grounds during public tour hours and began reading a statement protesting American policy in Southeast Asia. He refused to leave at closing time, and, after warnings by officers on the scene, he was arrested and charged with unlawful entry. Leiss contended that § 22–3102 was void for vagueness on its face in that it provided no ascertainable standards for law enforcement and thus failed to provide notice of the prohibited conduct. *Leiss, supra* at 805 & n.1.

We rejected the vagueness challenge, reasoning that the statute is "aimed at certain limited conduct which is constitutionally subject to restraint. It prohibits the act of entering or remaining upon any property when such conduct is *both* without legal authority *and* against the expressed will of the person lawfully in charge of the premises." *Id.* at 806 (emphasis added). More specifically, as to the first criterion, "to be subject to the statute's sanctions, one must be *without legal right* to trespass upon the property in question." *Id.* (emphasis added). We held, accordingly, that the statute was not unconstitutional on its face precisely because it did not permit law enforcement officers upon "mere whim," *id.*, to order persons off White House property. To the contrary, Leiss was lawfully arrested and convicted because there constitutionally had to be—and there was—an objective, discernible basis for asking him to leave separate from the general language of the statute itself:

It is incontrovertible that appellant was aware that the statute prohibited his particular conduct. He could have had no doubt that his presence on the White House grounds *past the noon closing hour* would be against the will of the persons in lawful charge of the premises. *That will was expressed by the sign on the gate restricting visiting hours*, and by Captain Manthos' plain advice that appellant was forbidden to remain upon the premises after the closing hour. [*Id.* at 807 (emphasis added).] [3]

Four years later in *Carson v. United States*, D.C.App., 419 A.2d 996 (1980)—a

---

**3.** Although D.C.Code 1973, § 22–3102, governs criminal trespass on both private and public property, *Leiss* has the practical effect of making an important distinction between the two situations. To establish a criminal trespass on private property, the government has to make only a single showing: that the defendant entered or remained on the property against the expressed will of the lawful occupant. Because a person's presence on private property generally is at the pleasure of the lawful occupant, the demand of that occupant to leave in itself deprives the other party of "lawful authority" to remain on the premises, *Feldt v. Marriott Corp.*, D.C.App., 322 A.2d 913, 915–16 (1974)—subject, however, to the defense of a good faith, reasonable belief in the right to remain on someone else's property. *Gaetano v. United States*, D.C.App., 406 A.2d 1291, 1294 (1979).

In contrast, *Leiss* establishes, as to public property, that the government affirmatively must make two showings: (1) that a person in charge of the premises expressly ordered him or her to leave, and (2) that the alleged trespasser otherwise had no lawful authority to remain, *i.e.*, a showing based on a ground independent of the evictor's wishes. For example, an individual walking on the Capital Mall in a quiet and peaceful manner could not be held criminally liable solely for failure to obey a police officer's order to leave that public property; there would have to be a legitimate, additional basis for the order. The trial court thus incorrectly stated the rule applicable here:

THE COURT: If Brady has the authority under the statute because he is the lawful occupant, and he tells them he wants them to leave, they are obligated to leave.
\* \* \* \* \* \*
He is in the same position as I am in my house. If I tell you to leave my house, you may be there lawfully and at any invitation, but when I revoke the invitation and tell you to leave you are obligated to leave.

case the majority virtually ignores—we re-affirmed and elaborated the point:

> Thus, under the statute as construed in *Leiss*, individual citizens may not be ejected from public property on the order of the person lawfully in charge *absent some additional, specific factor establishing their lack of a legal right to be there.* *See United States v. Nicholson*, D.C.Ct. Gen.Sess., [9]7 Wash.D.L.Rep. 1213, 1216 (July 17, 1969), *aff'd*, D.C.App., 263 A.2d 56 (1970). Such factors may consist of posted regulations, signs or fences and barricades regulating the public's use of government property, or other reasonable restrictions. [*Id.* at 998 (emphasis added).]

In *Carson*, the "specific factor," known to the defendant, that justified the arrest was "a chain suspended from stanchions at a height of from eighteen inches to three and one-half feet, over which appellants had to step or jump to reach the area in which they were arrested." *Id.* Just as the defendant in *Leiss* knew he was present unlawfully because he had stayed past posted White House visiting hours, the defendant in *Carson* knew he was vulnerable to arrest because he had gone into an area that was clearly marked off limits.

Accordingly, we have recognized in both *Leiss* and *Carson* that, in order to justify a conviction for unlawful entry on the White House grounds, due process requires notice of specific, prohibited conduct in addition to the bare, official warning to leave under the general authority of the statute itself. *Leiss* at 806; *Carson* at 998.[4] Absent such notice, the unlawful entry statute, though not void on its face, will be void for vagueness as applied. *See Parker v. Levy*, 417 U.S. 733, 757, 94 S.Ct. 2547, 2562, 41 L.Ed.2d 439 (1974); *Palmer v. City of Euclid*, 402 U.S. 544, 545–46, 91 S.Ct. 1563, 1564, 29 L.Ed.2d 98 (1971) (per curiam); *Cox v. Louisiana*, 379 U.S. 536, 559, 568, 85 S.Ct. 476, 482, 13 L.Ed.2d 487 (1965); *Leiss, supra* at 807; *Whittlesey v. United States*, D.C.App., 221 A.2d 86, 89 (1966).

## II.

The notice requirement under the unlawful entry statute may be satisfied by constructive, as well as actual, notice of the "specific factor establishing their lack of a legal right to be there." *Carson, supra* at 998. But that is the rub, for there is no evidence that appellants knew or could have known of any restriction applicable to their conduct.

---

**4.** Due process precludes the state from punishing behavior deemed criminal unless the state gives fair warning to the public so that (1) individuals may assuredly conform their conduct to the law, *see Papachriston v. City of Jacksonville*, 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972); *Bouie v. City of Columbia*, 378 U.S. 347, 351, 84 S.Ct. 1697, 1701, 12 L.Ed.2d 894 (1964); (2) law enforcement officials will be able to act evenhandedly, *see Smith v. Goguen*, 415 U.S. 566, 573, 575–76, 94 S.Ct. 1242, 1247, 1248–49, 39 L.Ed.2d 605 (1974); *Grayned v. City of Rockford*, 408 U.S. 104, 113–14, 92 S.Ct. 2294, 2301–02, 33 L.Ed.2d 222 (1972); *Papachristou, supra*, 405 U.S. at 162, 92 S.Ct. at 843; *Coates v. City of Cincinnati*, 402 U.S. 611, 614, 91 S.Ct. 1686, 1688, 29 L.Ed.2d 214 (1971); *Shuttlesworth v. City of Birmingham*, 382 U.S. 87, 90, 93 (1965); *Cox v. Louisiana*, 379 U.S. 559, 568–69 (1965); and (3) triers of fact will have adequate guidance for determining guilt or innocence. *See Bouie, supra* 378 U.S. at 353, 84 S.Ct. at 1702. *See generally* 1 C. Antieau, Modern Constitutional Law § 5.1, at 288 (1969). In short, as the

Supreme Court stated in *Smith, supra*, 415 U.S. at 574, 94 S.Ct. at 1248: due process requires that all persons " 'be informed as to what the State commands or forbids,' *Lanzetta v. New Jersey*, 306 U.S. 451, 453, 59 S.Ct. 618, 619, 83 L.Ed. 888 (1930), and that 'men of common intelligence' not be forced to guess at the meaning of the criminal law. *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926)."

Akin to this requirement of advance warning of the content of the criminal law is the constitutional principle that the state cannot convict a person for engaging in conduct that it has only since made criminal. *See, e.g., Marks v. United States*, 430 U.S. 188, 196, 97 S.Ct. 990, 995, 51 L.Ed.2d 260 (1977); *Douglas v. Buder*, 412 U.S. 430, 432, 93 S.Ct. 2199, 2200, 37 L.Ed.2d 52 (1973) (per curiam); *Rabe v. Washington*, 405 U.S. 313, 315–16, 92 S.Ct. 993, 994–95, 31 L.Ed.2d 258 (1972) (per curiam); *Bouie, supra* 378 U.S. at 355, 84 S.Ct. at 1703; *Bowyer v. United States*, D.C.App., 422 A.2d 973, 980–81 (1980).

In the first place, the record contains no reference to any statute (other than § 22–3102 itself) or to any published rule or regulation relevant to appellants' conduct. *Compare Parker v. Levy, supra,* 417 U.S. at 757, 94 S.Ct. at 2562 (court martial conviction under the military code not a denial of due process where the conduct prohibited was within the definitions and examples contained in manual available to members of the military); *Booker v. United States,* D.C.App., 283 A.2d 446, 447 & n.1 (1971) (conviction under unlawful entry statute upheld where City Council chairman ordered boisterous protestors to leave Council chamber in accordance with published Council rules of procedure requiring decorum during session); *United States v. Approximately 633.79 Tons of Yellowfin Tuna,* 383 F.Supp. 659, 662 (S.D.Cal.1974) (statute governing taking of tuna not void for vagueness; although required regulations are subject to change, "it can hardly be held that anyone is subject to forfeiture without proper notice. The regulations are clear and are readily available to the public.").

Second, although unpublished policies also may serve to withdraw "lawful authority" to remain on public property, due process requires meaningful notice of such restrictions, such as "posted regulations" or "signs". *Carson, supra* at 998; *see Leiss, supra* at 808–09; *Whittlesey, supra* at 89.[5] In this case, appellants did not have access to the unpublished memorandum of January 18, 1978 regulating "demonstrations" on White House property. *Ante* at 967. No posting or other warning gave advance notice of a Secret Service policy to prohibit "demonstrations" on the White House grounds. Captain Elgin testified that a sign at the outside perimeter post where visitors entered the grounds specified the visiting hours and prohibited smoking and picture-taking. Appellants acted within the limits of the posted rules.

Third, even assuming verbal warnings based on unpublished policies can provide adequate notice, the officers never told appellants that a "no demonstrations" policy was in effect. In asking appellants to leave, the officers only invoked the unlawful entry statute itself.[6]

Finally, absent a published regulation, a posted notice, or a verbal explanation of internal policy, appellants' particular use of White House property did not in itself suggest a self-evident prohibition against their activity, for a limited area of the White House grounds is open to the public and, until recently, peaceful speech activities had been permitted there. *Ante* at 966 n.5. Appellants entered lawfully through the tour line and attempted to communicate their message in an area open to the public during regular tour hours. Neither the government nor the trial court suggested that their demonstration, including their use of an undisclosed amount of ashes and water, resulted in destruction or defacement of property. Nor did appellants interfere with any surrounding activity. In the words of the trial judge:

> They didn't obstruct the normal course of the line flowing into the White House. The objection to their presence, if any, was aesthetic. They weren't supposed to be lying down and making a display, but they were not obstructing anybody.

> Again I repeated myself that you were in violation of the Unlawful Entry Act, and if you didn't leave you would be arrested.
> [Sergeant Elexia] said that you are in violation of the Unlawful Entry Act, and if you don't leave you will be arrested.
> Lieutenant Jenkins came on the scene, and he informed them that they were in violation of the Unlawful Entry Act, and if they didn't leave they would be arrested.

Captain Elgin testified that the Secret Service informed any visitor carrying a placard to leave it at the gate. The record contains no evidence that appellants brought in any sign that would have triggered this warning.

---

5. *Cf. Niemotko v. Maryland,* 340 U.S. 268, 271, 71 S.Ct. 325, 327, 95 L.Ed. 267 (1951) (convictions for disorderly conduct violated rights to free speech and equal protection when Park Commissioner and City Council denied Jehovah's Witnesses permission to use park; no statute or ordinance required permit, and custom of requesting permission provided no standards).

6. Officer Brady testified:
> I advised Miss Smith that she was in violation of the Unlawful Entry Act and that if she didn't leave that she would be arrested.

The circumstances here contrast with a situation, for example, in which members of the public disturb the peace, disrupt government operations, or deface or despoil public property—and thus should be aware of the illegality of their acts. *Compare Hurley v. Hinckley*, 304 F.Supp. 704, 709–12 (D.Mass. 1969) (dicta treating disrupters of welfare office differently from peaceful protester under unlawful entry statute), *aff'd mem. sub nom. Doyle v. O'Brien*, 396 U.S. 277, 90 S.Ct. 603, 24 L.Ed.2d 469 (1970). Nor is this a case in which individuals have refused to leave a roped-off area or a room blocked off to tourist traffic—and thus should perceive themselves as trespassers. In *Carson, supra*, for example, we upheld the conviction of protesters because they crossed over a chain separating the tourist roadway from the White House lawn, a barrier that warned the defendants that their presence on the lawn was unauthorized. *See id.* at 998. In contrast, the circumstances here—especially given the history of permissible demonstrations on White House grounds—did not put appellants on notice that they were not permitted to lie on the ground in the public area in a mixture of ashes and water, or to talk to tourists in a non-obstructive manner at the side of the tourist line.

### III.

In summary, even if the Secret Service lawfully can establish a policy barring demonstrations from the White House grounds—and clearly it can—the government cannot predicate criminal liability on that policy unless it gives the public reasonable notice of the conduct prohibited. *See* note 4 *supra*. In the present case, appellants had no notice that White House officials, as a matter of policy, would permit no demonstrations in the public area. Thus, the unlawful entry statute, as applied to appellants, violated due process.

The government obviously is concerned that appellants did not receive the kind of notice required for evictions from public property, for it has pressed the argument that the White House, as the President's home, is better characterized as private not public property.[7] It would follow that in order to convict for unlawful entry, the government only would have to prove that a person lawfully in charge had ordered appellants to leave; convictions for trespass on private property do not require an additional, independent showing of no "lawful authority to remain." D.C.Code 1973, § 22–3102; *see* note 3 *supra.*

We rejected that argument in *Carson, supra* at 998. The en banc court apparently does so again today; my colleagues in the majority do not purport to change the *Leiss-Carson* test for unlawful entry at the White House. Actually, however, my colleagues straddle the issue. They neither recharacterize the White House as "private" property nor explain, if it is "public," how appellants are to know that their conduct is criminal—aside from the word of the police.[8] The majority prefers to rely solely on the assertion, with which I agree, that it is not "unreasonable for the Secret Service to limit the public's access to the White House solely to the purpose of touring through portions of the Executive Mansion." *Ante* at 966. This begs the question, however, for it says only that the Secret Service had the power to limit access while ignoring the requirement that the power be exercised in accordance with due process.

---

7. The government states in its brief: "Although the White House belongs to the United States, it is truly misleading to call it 'public property.' The White House is the private residence of the President of the United States, not a public park. The President and his designees have the same authorty over the White House grounds that a private citizen has over his residence. The interior grounds of the White House are not a public forum and appellants were obliged to leave when requested to do so."

8. The majority therefore must agree with the government's alarming assertion in its supplemental brief that appellants "*were not entitled to know the basis of the officer's action* so that they could debate with him whether they had 'lawful authority' to remain." (Emphasis added.)

Given a history of permissible, peaceful demonstrations on the public area of the White House grounds, *ante* at 966 n.5, my colleagues advance an unsatisfactory basis for affirming appellants' convictions. I respectfully dissent.[9]

**9.** Contrary to Chief Judge Newman's view, I agree with the majority, *see ante* at 966 n.5, that if appellants had received proper notice of the ban on "demonstrations," their arrest and conviction would have been lawful. I find that term sufficiently understandable to withstand challenge on the ground it is unconstitutionally vague. *See generally Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* —— U.S. ——, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982).