*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 22-CM-0795 & 22-CM-0812

EARL A. GLOSSER and KRISTINA MALIMON, APPELLANTS,

v.

UNITED STATES OF AMERICA, APPELLEE.

Appeals from the Superior Court
of the District of Columbia
(2021-CMD-000187 & 2021-CMD-000195)

(Hon. Neal E. Kravitz, Trial Judge)

(Argued January 23, 2024                    Decided July 18, 2024)

*Thomas G. Burgess* for appellant Earl A. Glosser.

*Richard P. Goldberg* for appellant Kristina Malimon.

*Mark Hobel*, Assistant United States Attorney, with whom *Matthew M. Graves*, United States Attorney, and *Chrisellen R. Kolb*, *Nicholas P. Coleman*, *Cameron Tepfer*, and *Kathleen Gibbons*, Assistant United States Attorneys, were on the brief, for appellee.

Before MCLEESE, DEAHL, and HOWARD, *Associate Judges*.

MCLEESE, *Associate Judge*: Appellants Earl A. Glosser and Kristina Malimon challenge their convictions for unlawful entry on public property, arguing that there was insufficient evidence to support their convictions. We affirm.

## I. Facts and Procedural Background

### A. The United States's Evidence

The United States introduced the following evidence at trial. On January 6, 2021, a violent crowd entered the United States Capitol Grounds and Building while Congress was in the process of certifying the results of the 2020 presidential election. The Chief of the United States Capitol Police ("USCP") asked the Metropolitan Police Department ("MPD") to send any available assistance to the Capitol Grounds. In light of that request, MPD officers had "the same authority on the Capitol Grounds" as USCP officers.

The proceedings in Congress were suspended, and the Capitol Police Board imposed a curfew and ordered closure of the Capitol Grounds to the public from 6:00 p.m. on January 6, 2021, until 6:00 a.m. on January 22, 2021. Mayor Muriel Bowser also declared a public emergency in the District of Columbia and ordered a city-wide curfew from 6:00 p.m. on January 6, 2021, to 6:00 a.m. on January 7, 2021. At 2:28 p.m. on January 6, the D.C. government sent an alert to all cell phones in D.C. notifying users of the D.C. curfew.

With the assistance of the National Guard, the USCP and the MPD secured the Capitol Building and then began to try to push the rioters away from the Capitol

Building.  A crowd of more than one hundred people was on a paved area in the vicinity of the Peace Memorial on the Capitol Grounds.  A police line moved toward the edge of the Capitol Grounds, attempting to move the crowd off of the Capitol Grounds and away from the Capitol Building.  Officers directed the crowd to keep walking towards 3rd Street and to disperse.  Officers left the 3rd Street exit from the Capitol Grounds open so that the crowd could leave in that direction.  A row of bike-rack barriers lay across the parking lot in the middle of the block, with openings on the right and left.

At approximately 7:17 p.m., MPD determined that it was time to arrest those in the crowd who refused to disperse.  MPD used a speaker to issue three separate warnings that those in the area were in violation of the curfews and would be arrested if they did not leave the area.  The warnings were loud and clearly audible.  Crowd members heard the warnings, and the overwhelming majority of the crowd complied and left the Capitol Grounds by the 3rd Street exit.

Mr. Glosser and Ms. Malimon were among the minority who did not leave. Video from body-worn-camera footage shows Mr. Glosser standing directly in front of the police line while all three warnings play.  Ms. Malimon joined Mr. Glosser during the third warning.  Neither made any effort to leave.  As the police line moved forward, Mr. Glosser pressed himself against a riot shield and had to be physically

removed by an MPD officer.  Mr. Glosser argued with the police, repeatedly calling them "Nazis."

The police began escorting members of the crowd through openings in the bike-rack barriers that indicated the exit to 3rd Street.  Mr. Glosser and Ms. Malimon passed through a barrier opening at 7:22 p.m.  Mr. Glosser shouted, "You're a Nazi" to a police officer, and then stated that the officer was "pushing me out where I have the legal right to stand."  The officer responded, "No, no, no.  You're in violation of a curfew."  Mr. Glosser responded "I'm not in violation of a curfew!  That's arbitrary!  That's arbitrary, made-up, fucking bullshit-ass law!"

Mr. Glosser and Ms. Malimon then turned back towards the Capitol Building and continued filming the police with their cell phones.  As Ms. Malimon walked directly in front of a police officer, the officer shouted at her, "You're in violation of the Mayor's curfew—clear out."  Ms. Malimon ignored him.  When an officer reminded Mr. Glosser that a curfew was in effect, Mr. Glosser responded that he was "good right now" and would "wait for the shields to push [him] out."  Ms. Malimon verbally agreed with another crowd member who shouted that they could "stand here at any time of the fucking day that [they] want[ed]."

At approximately 7:27 p.m., police officers began making arrests, and they arrested both Mr. Glosser and Ms. Malimon.

## B. The Defense's Evidence

Ms. Malimon testified in her own defense. Ms. Malimon traveled from Oregon with her mother to attend a rally on the Ellipse on January 6, 2021, relating to claims that the 2020 presidential election had been stolen. Ms. Malimon testified that she had limited signal on her phone and had not known about the breach of the Capitol Building when she arrived in the area of the Capitol at 7:15 p.m. Ms. Malimon denied being aware at the time of the incident that she was on the Capitol Grounds.

Ms. Malimon testified that she did not hear any of the warning announcements from the police. She acknowledged saying to officers, "They're taking our country and you're not standing on the right side." Ms. Malimon testified that she first learned that officers wanted her to leave the area at 7:29 p.m. when she was told to do so by a police officer. Ms. Malimon was impeached with body-worn-camera footage of an officer telling her at 7:23 p.m. that she was in violation of the Mayor's curfew and needed to leave.

Ms. Malimon testified that she tried to leave the area multiple times but the police would not allow her to do so. Ms. Malimon also testified that she was trying to leave before 7:29 p.m., but she was impeached with body-worn-camera footage showing her filming police with her phone at 7:23 p.m.

### C. Post-Trial Briefing and Verdict

After closing arguments, the trial court requested additional briefing on the following question about the elements of unlawful entry: "Does the government have to prove beyond a reasonable doubt that the defendant was ordered to leave the United States Capitol grounds as opposed to ordered to leave the location where they were?" Ms. Malimon argued that the MPD was required to announce or otherwise make clear that the defendants were being required to leave the Capitol Grounds specifically. The government disagreed, arguing that it was not required to prove that a defendant was instructed to leave a specific property by specifying the name, metes, or bounds of the precise property. Instead, a person lawfully in charge of the property need only direct an individual to leave. With respect to the intent element of unlawful entry, the government explained that a refusal to quit a property need not be purposeful or knowing; the government must only establish that the defendant knew or should have known that remaining on the property was unwanted.

The trial court concluded that the unlawful-entry statute did not require proof that, in directing Mr. Glosser and Ms. Malimon to leave, the police specified a particular piece of property. The trial court also acknowledged the argument that Mr. Glosser and Ms. Malimon were told that they were remaining in violation of the

Mayor's curfew rather than the Capitol Police curfew, but the trial court concluded that the distinction was not legally relevant.

The trial court found beyond a reasonable doubt that Mr. Glosser and Ms. Malimon were on the Capitol Grounds; were directed to leave by MPD officers who were acting lawfully at the request of the USCP, the entity lawfully in charge of the Capitol Grounds; knew that they were remaining on the property against the will of the police; and refused to leave despite multiple warnings and opportunities to do so. The trial court therefore found both Mr. Glosser and Ms. Malimon guilty of unlawful entry on public property.

The trial court repeatedly indicated that it did not credit Ms. Malimon's testimony. The trial court described Ms. Malimon's testimony "that she was unaware of what happened on January 6th when she went to the Capitol grounds" as "so far beyond belief" as to be "probably more incredible than any [testimony the court had] ever heard."

## II. Analysis

Mr. Glosser and Ms. Malimon argue that the evidence was insufficient to support their convictions. We disagree.

## A. Standard of Review and Background Legal Principles

We review de novo "the elements of a crime which the prosecution must prove to support a conviction." *Duffee v. District of Columbia*, 93 A.3d 1273, 1274 (D.C. 2014) (internal quotation marks omitted). More generally, "[w]hen assessing the sufficiency of the evidence, we view the evidence in the light most favorable to the verdict, giving full play to the right of the fact-finder to determine credibility, weigh the evidence, and draw justifiable inferences of fact." *Roberts v. United States*, 216 A.3d 870, 882 (D.C. 2019) (internal quotation marks omitted). "The evidence is sufficient if, after viewing it in the light most favorable to the verdict, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (internal quotation marks omitted).

The statute prohibiting unlawful entry on public property provides:

> Any person who, without lawful authority, shall enter, or attempt to enter, any public building, or other property, or part of such building, or other property, against the will of the lawful occupant or of the person lawfully in charge thereof or his or her agent, or being therein or thereon,

> without lawful authority to remain therein or thereon shall refuse to quit the same on the demand of the lawful occupant, or of the person lawfully in charge thereof or his or her agent, shall be deemed guilty of a misdemeanor . . . .

D.C. Code § 22-3302(b).

We have said that the elements of the type of unlawful entry that involves remaining on premises without authority are:

> 1. That the defendant was present in a public or private dwelling, building, or other property, or a part of such dwelling, building, or other property;
>
> 2. That the defendant was directed to leave the property by the lawful occupant or person lawfully in charge of the property;
>
> 3. That at the time s/he was directed to leave the property, the defendant was without lawful authority to remain there; and
>
> 4. That upon being directed to leave the property, the defendant refused to leave.

*District of Columbia v. Murphy*, 631 A.2d 34, 37 n.6 (D.C. 1993) (internal quotation marks omitted). In cases involving public property under D.C. Code § 22-3302(b), remaining without authority requires proof "(1) that a person lawfully in charge of the premises expressly order[ed] the party to leave, and (2) that, in addition to and independent of the evictor's wishes, there exist[ed] some additional specific factor establishing the party's lack of a legal right to remain." *O'Brien v. United States*, 444 A.2d 946, 948 (D.C. 1982).

This court has explained that "the mental states for entry and for doing so against the will of the lawful occupant are both clearly discernible and distinct." *Ortberg v. United States*, 81 A.3d 303, 307-08 (D.C. 2013) (internal quotation marks omitted). "[T]he physical act of entry must be purposeful and voluntary—not accidental or mistaken," whereas the "mental state with respect to acting against the will of the owner or lawful occupant . . . [is] that the defendant knew or should have known that [the] entry was unwanted." *Id.* at 308. We have subsequently raised the question whether the "should have known" standard stated in *Ortberg* remains good law in light of this court's subsequent decision in *Carrell v. United States*, 165 A.3d 314 (D.C. 2017) (en banc). *E.g.*, *Wicks v. United States*, 226 A.3d 743, 749-50 (D.C. 2020). We need not decide that question in the present case, however, because the trial court found that Mr. Glosser and Ms. Malimon knew that they were remaining against the will of the police. We conclude that the evidence was sufficient to support that finding.

## B.  Sufficiency of the Evidence

Mr. Glosser and Ms. Malimon make a series of somewhat overlapping arguments in challenging the sufficiency of the evidence to support their convictions. We are not persuaded by those arguments.

First, Mr. Glosser and Ms. Malimon argue that the directives given to them to leave were legally inadequate, because those directives did not tell Mr. Glosser and Ms. Malimon where exactly they were supposed to go in order to comply. Neither our cases nor any other cases of which we are aware, however, support imposition of a flat requirement that a directive to leave must also contain explicit and specific directions about where to go to comply. *See, e.g.*, *Smith v. United States*, 445 A.2d 961, 963, 968 (D.C. 1982) (en banc) (upholding unlawful-entry conviction where protestors in White House tour line were told to "leave" and did not do so). To the contrary, at least one court appears to have explicitly concluded that such directions are not flatly required. *See McGovern v. George Washington Univ.*, 245 F. Supp. 3d 167, 172-73, 186 (D.D.C. 2017) (special police officer had probable cause to arrest plaintiff for unlawful entry where plaintiff disrupted speech, officer asked plaintiff to come with officer, plaintiff did not acknowledge officer, officer grabbed plaintiff's forearm, and plaintiff struggled against being physically removed; "Notwithstanding the plaintiff's suggestions to the contrary, under District of Columbia law, the will of the lawful occupant need only be objectively manifest through express or implied means. Although the statute requires a demand before a person may be held liable for refusing to quit another's premises, such demand need not take any particular form, as long as a reasonable person would understand that he was required to leave. Consequently, for the offense of unlawful entry, the

existence of probable cause turns on whether a reasonable person would believe the plaintiff was refusing to quit the premises after being required to do so by a person lawfully in charge.") (citation and internal quotation marks omitted), *aff'd*, 891 F.3d 402, 405-06 (D.C. Cir. 2018).

We hold that specific directions about where to go are not a required element under the unlawful-entry statute. That is particularly clear in this case, where the evidence does not show any reasonable attempt by Mr. Glosser or Ms. Malimon to leave the immediate area. For example, consider a scenario in which a person is standing inside a store, a special police officer ("SPO") tells the person to leave, and the person refuses to move. In our view, the SPO's directive to leave is legally adequate even though the SPO did not explicitly state where the person needed to go to comply. To be clear, however, we do not mean to imply that the lack of specific directions about how to comply is always legally irrelevant to whether an unlawful-entry conviction is justified. If the person in the preceding scenario responded by leaving the store building but remaining outside on a store-owned parking lot, the person might well have a persuasive argument that the person did not know or have reason to know that remaining in the parking lot outside the store building would be against the will of the SPO acting on behalf of the owner of the store property.

Second, to the extent that Mr. Glosser and Ms. Malimon argue that the evidence did not permit the trial court to find beyond a reasonable doubt that they knew that their conduct in remaining was against the will of the officers on the scene, we uphold the trial court's finding. As explained *supra*, there was ample evidence that Mr. Glosser and Ms. Malimon were repeatedly told to leave and refused to do so, even though the vast majority of other people present did leave. The trial court reasonably inferred that Mr. Glosser and Ms. Malimon knew that their conduct in refusing to leave was contrary to the will of the police on the scene.

Third, Ms. Malimon appears to suggest that the MPD officers were not lawfully in charge of the premises. We conclude that there was sufficient evidence to support the trial court's determination that the MPD officers were lawfully in charge of the premises. Specifically, there was evidence that the Capitol Police had asked the MPD for assistance in clearing the Capitol Building and Grounds and that in light of that request the MPD officers had the same authority on the Capitol Grounds as USCP officers. *See also* 2 U.S.C. § 1961(a) (authorizing MPD to patrol and make arrests on Capitol Grounds "with the consent or upon the request of" USCP); D.C. Code § 10-503.19 (same). There also was evidence that the Mayor had issued a curfew. That being so, we conclude that the MPD officers had lawful authority to direct persons, whether on the Capitol Grounds or not, to leave public spaces such as the area where Mr. Glosser and Ms. Malimon were present.

Fourth, Ms. Malimon argues that in any event there was insufficient evidence that Mr. Glosser and Ms. Malimon *knew* that the MPD officers were lawfully in charge of the premises. We disagree. It is true that there was no direct evidence that Mr. Glosser and Ms. Malimon were informed that the MPD had been authorized by the USCP to clear rioters from the Capitol Grounds or to enforce a curfew. Nevertheless, we conclude that the trial court could reasonably infer that Mr. Glosser and Ms. Malimon knew that the officers directing them to leave had authority to do so. *See generally, e.g.*, *Owens v. United States*, 90 A.3d 1118, 1122 (D.C. 2014) ("[T]he task of discerning a defendant's knowledge . . . usually requires a [fact-finder] to rely on reasonable inferences rather than direct proof."). As the body-worn-camera footage makes clear, Mr. Glosser and Ms. Malimon were in a position to observe that numerous police officers, including MPD officers, were responding to a public disturbance in a public place. The trial court could reasonably infer that Mr. Glosser and Ms. Malimon knew that the MPD officers were acting lawfully in trying to clear the area. That is true, moreover, even if Mr. Glosser and Ms. Malimon did not know the precise legal details of the basis for that authority. For example, consider again the scenario discussed previously, in which an SPO directs a person to leave a store. If the SPO is in uniform, for example, a fact-finder presumably could infer that the person knows that the SPO is lawfully in charge of the premises,

even if there is no evidence that the person knows the specific statutory provisions or contractual arrangements that gave rise to that authority.

Fifth, Mr. Glosser and Ms. Malimon argue that, in the warnings that the trial court found Mr. Glosser and Ms. Malimon heard, the MPD officers stated that they were enforcing the Mayor's curfew, not the curfew imposed by the USCP. (Some warnings also referred to the USCP curfew, but the trial court did not explicitly find that Mr. Glosser and Ms. Malimon heard those particular warnings, so we do not rely on them.) The trial court did not view that as relevant to its verdict, and we uphold the trial court's ruling on that point. We have already explained that the MPD officers had legal authority to enforce the Mayor's curfew, including on the Capitol Grounds. We see no reason why the MPD officers' reference to that curfew required the trial court to conclude that Mr. Glosser and Ms. Malimon did not know that the MPD officers had lawful authority to direct persons to leave.

Sixth, and relatedly, Ms. Malimon argues that she had a "bona fide belief" in her right to refuse the MPD officers' orders to leave the Capitol Grounds because the MPD, not the USCP, ordered her to leave the Capitol Grounds. *See generally, e.g.*, *Smith v. United States*, 281 A.2d 438, 439 (D.C. 1971) ("Where a person enters a place with a good purpose and with a bona fide belief of his right to enter, [the person] lacks the element of criminal intent . . . and is not guilty of unlawful entry.").

"[A] bona fide belief must have some justification—some reasonable basis." *Wiley v. United States*, 264 A.3d 1204, 1209 (D.C. 2021) (internal quotation marks omitted). This contention provides no basis for relief. Ms. Malimon introduced no evidence suggesting that she believed, in good faith or otherwise, that she was entitled to disregard the MPD officers' orders because she was on the Capitol Grounds. To the contrary, Ms. Malimon testified that she was trying to follow the MPD officers' directions, "looking for a way to leave" and being "obedient to police officers." Moreover, Ms. Malimon testified that she was not "aware" that she was on Capitol Grounds at the time, which undermines any theory that she remained based on a belief that the MPD officers lacked authority to direct her to leave the Capitol Grounds. *See, e.g.*, *Darab v. United States*, 623 A.2d 127, 136-37 (D.C. 1993) (holding that evidence was sufficient to refute defense of bona fide belief of right to remain on premises where defendants heard warnings to leave and defendant's own testimony undermined bona fide belief).

Seventh, Mr. Glosser and Ms. Malimon rely on this court's decision in *Wicks v. United States*, 226 A.3d 743 (D.C. 2020). We view *Wicks* as quite different from the present case. In *Wicks*, the Washington Nationals Baseball Club barred Mr. Wicks from its "property and grounds at 1500 S. Capitol Street SE." *Id.* at 744 (internal quotation marks omitted). A few weeks later, Mr. Wicks was arrested for unlawful entry while standing on a sidewalk running along one side of the Club's

stadium. *Id.* This court held that there was insufficient evidence that (a) the sidewalk was in fact part of the Club's property and (b) that Mr. Wicks knew or should have known that the sidewalk was part of the Club's property from which he had been barred. *Id.* at 744-45, 747-51. In contrast, as we have explained, the evidence in this case sufficed to support the conclusions that Mr. Glosser and Ms. Malimon were on the Capitol Grounds, that they were ordered to leave by police officers with authority to give that order, that they knew that the police had the authority to give that order, and that they nevertheless refused to leave.

Finally, Mr. Glosser and Ms. Malimon raise a number of primarily factual issues, claiming for example that in fact they made efforts to leave but were unable to do so. As previously noted, however, our review of the trial court's findings on such factual issues is quite deferential. We hold that the evidence summarized earlier in this opinion fully supports the trial court's contrary conclusion that Mr. Glosser and Ms. Malimon had ample opportunity to leave but chose not to do so.

For the foregoing reasons, we affirm the judgments of the Superior Court.

*So ordered.*